STEPHEN QUESENBERRY (8073)
HILL, JOHNSON & SCHMUTZ, L.C.
RiverView Plaza
4844 North 300 West, Suite 300
Provo, Utah 84604
Telephone: (801) 375-6600
Facsimile: (801) 375-3865
squesenberry@hjslaw.com

CHRISTOPHER K. LEIGH (FL 807941)
BARTHE & LEIGH LLP
Wells Fargo Tower
One East Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33301
Telephone: (954) 523-5555
Facsimile: (954) 523-5552
ckl@mac.com

*Attorneys for The Matrix Group, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE MATRIX GROUP, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>INNERLIGHT HOLDINGS, INC.,<br>and<br>INNERLIGHT WORLDWIDE, INC.,<br><br>Defendants. | **PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**<br><br>Civil No. 2:11-cv-00987<br>District Judge Clark Waddoups<br>Magistrate Judge Brooke C. Wells |

Plaintiff, The Matrix Group, LLC, by and through its undersigned counsel, hereby respectfully moves the Court pursuant to Fed.R.Civ.P. 15(a)(2), 21 and DUCiv 7-1(a) for the entry of an Order granting plaintiff leave to file an Amended Complaint.

Plaintiff commenced this diversity action pursuant to the Uniform Fraudulent Transfer Act ("UFTA") seeking redress for an alleged fraudulent transfer of assets from non-party

Innerlight, Inc. ("Innerlight") to existing defendants Innerlight Holdings, Inc. ("Innerlight Holdings") and Innerlight Worldwide, Inc. ("Innerlight Worldwide"), and associated declaratory judgment alter ego status and successor liability claims. This action was filed shortly after plaintiff was awarded a summary final judgment against Innerlight in a Florida state court. By way of the proposed Amended Complaint, Matrix seeks to add Innerlight to this case as a party defendant for two reasons. First, UFTA relief is now sought directly against Innerlight in the first through third claims for relief. Second, the Amended Complaint adds a new claim for relief (the eighth), an action on the Florida judgment against Innerlight under Utah common law. Additionally, the Amended Complaint expands substantially upon the existing allegations against defendants Innerlight Holdings and Innerlight Worldwide.

A true and correct copy of plaintiff's proposed Amended Complaint is attached as Exhibit "1" hereto. Plaintiff's memorandum in support of the motion is also filed concurrently herewith.

DATED this 29th day of February, 2012.

Respectfully submitted,

**HILL, JOHNSON & SCHMUTZ, L.C.**
**BARTHE & LEIGH LLP**


*/s/ Christopher K. Leigh*
Attorneys for the Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 29th day of February, 2012, I electronically filed plaintiff's motion for leave to file an Amended Complaint using CM/ECF. I also certify that the foregoing document is being served on this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner to receive electronically Notices of Electronic Filing.

*/s/ Christopher K. Leigh*

<u>SERVICE LIST</u>

Stephen Quesenberry
Hill, Johnson & Schmutz, L.C.
RiverView Plaza
4844 North 300 West, Suite 300
Provo, Utah 84604
Telephone: (801) 375-6600
Email: squesenberry@hjslaw.com

Christopher K. Leigh
Barthe & Leigh LLP
Wachovia Tower
One East Broward Boulevard, Suite 700
Fort Lauderdale, FL 33301
Phone: (954) 523-5555
Fax:    (954) 523-5552
Email: ckl@mac.com

*Counsel for the plaintiff*

Leslie W. Slaugh
Richard L. Petersen
Richard A. Roberts
Howard, Lewis & Petersen, P.C.
120 East 300 North Street
Provo, UT 84603
Telephone: (801) 373-6345
Email: SlaughL@ProvoLawyers.com

Thomas F.J. MacAniff
Catherine Nguyen
Eastburn And Gray, P.C.
60 East Court Street
Doylestown, PA 18901
Telephone: (215) 345-7000
Email: Tmacniff@eastburngray.com

*Counsel for the defendants*

STEPHEN QUESENBERRY (8073)
HILL, JOHNSON & SCHMUTZ, L.C.
RiverView Plaza
4844 North 300 West, Suite 300
Provo, Utah 84604
Telephone: (801) 375-6600
Facsimile: (801) 375-3865
squesenberry@hjslaw.com

CHRISTOPHER K. LEIGH (FL 807941)
BARTHE & LEIGH LLP
Wells Fargo Tower
One East Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33301
Telephone: (954) 523-5555
Facsimile: (954) 523-5552
ckl@mac.com

*Attorneys for The MATRIX GROUP, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE MATRIX GROUP, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> INNERLIGHT, INC., <br><br> INNERLIGHT HOLDINGS, INC., and <br> INNERLIGHT WORLDWIDE, INC. <br><br> Defendants. | **AMENDED COMPLAINT** <br><br> Civil No. 2:11-CV-00987 <br> District Judge Clark Waddoups <br> Magistrate Judge Brooke C. Wells <br><br> Jury Trial Requested |

Plaintiff, The Matrix Group, LLC (hereinafter, "Matrix" or Plaintiff), for its Amended

Complaint, hereby complains against defendants, Innerlight, Inc. ("Innerlight"), InnerLight

Holdings, Inc. ("InnerLight Holdings") and InnerLight Worldwide, Inc. ("InnerLight

Worldwide") as follows:

## I.      INTRODUCTION

This is an action under the Uniform Fraudulent Transfer Act (UTAH CODE ANN. § 25-6-1, *et. seq.*) to recover assets transferred from defendant Innerlight to defendants InnerLight Holdings and/or InnerLight Worldwide; for a judgment pursuant to 28 U.S.C. § 2201 (2011) declaring InnerLight Holdings and/or InnerLight Worldwide the alter egos and successors to Innerlight; and an action on a judgment against Innerlight.

## II.      THE PARTIES

1.      Plaintiff, Matrix is a Florida limited liability company with its principal place of business in Palm Beach County, Florida. The members of Matrix are two adult individuals, Anthony R. Catinella and Edward R. Tinari, both of whom are domiciled in the State of Florida.

2.      Defendant, Innerlight a/k/a InnerLight is a Delaware corporation with its principal place of business at 867 East 2260 South, Provo, Utah 84606.

3.      Upon information and belief, Innerlight is wholly-owned by defendant InnerLight Holdings.

4.      The President of Innerlight is Mr. Kevin Brogan ("Brogan").

5.      Defendant, InnerLight Holdings is a Delaware corporation with its principal place of business at 867 East 2260 South, Provo, Utah 84606.

6.      Upon information and belief, the President of InnerLight Holdings is Mr. Brogan.

7.      Defendant InnerLight Worldwide is a Delaware corporation with its principal place of business at 867 East 2260 South, Provo, Utah 84606.in Provo, Utah.

8.      Upon information and belief, the President of InnerLight Worldwide is Mr. Brogan.

9.    Upon information and belief, InnerLight Worldwide is wholly-owned by InnerLight Holdings.

## III.    JURISDICTION AND VENUE

10.    This Court has original subject matter jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1) in that the matter in controversy exceeds the sum of $75,000.00, exclusive of interest, costs and attorney's fees, and is between citizens of different States.

11.    This Court has general personal jurisdiction over defendants in that defendants conduct substantial and continuous local activity in the State of Utah. Alternatively, this District has specific personal jurisdiction over defendants in that defendants the transact business within this state under UTAH CODE ANN. § 78B-3-205(1) and/or defendants own, use, or possess real estate situated in this state under UTAH CODE ANN. § 78B-3-205(4).

12.    Venue is proper in this District under 28 U.S.C. § 1391(a)(1) in that all defendants reside in the State of Utah and, upon information and belief, under 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## IV.    FACTUAL BACKGROUND

### A.    InnerLight International builds a business of selling dietary supplements

13.    Upon information and belief, in 1987 or 1988, a nutritional and dietary supplement company named InnerLight International, Inc. ("InnerLight International ") was established by Robert O. Young and his wife Shelley R. Young (collectively, the "Youngs"). Upon information and belief, InnerLight International was a Utah corporation which had its place of business at 867 East 2260 South, Provo, Utah 84606 (the current place of business of all the defendants). InnerLight International promoted an "alkalarian" diet and lifestyle intended to

reduce excessive acid levels in the body. Its two best-selling products were "Supergreens" and "Prime pH". Mr. Young developed a loyal following over the years as proponents of the alkalarian diet and lifestyle. Upon information and belief, Supergreens and Prime pH remain to this day among the best-selling "Innerlight" products.

14.     Upon information and belief, during this 1987-1988 time period, the Youngs also formed Hikari Holdings, L.C. ("Hikari Holdings"), a company which that held their intellectual property.

15.     InnerLight International's products were sold primarily through independent distributors under a multilevel marketing ("MLM") business model. MLM, also known as network marketing, involves using independent distributors, who are independent contractors, as salespeople for a product. One distributor sells to another, who sells to another down the line, and so on. When distributors sell products at retail cost, they earn the difference between that cost and wholesale cost. They also receive commissions on the sales of any products bought for personal use or resale by distributors under them. They can sell to anyone in the general public, including friends, relatives, co-workers, and people attracted through brochures and flyers. A buyer of the product can, but is not required to, become a distributor himself.

16.     The MLM business model remained in place for defendant Innerlight (f/k/a Darius Marketing, Inc.) upon the purchase of InnerLight International (described below at paragraphs 20 and 21) and has remained in place for defendants InnerLight Holdings and InnerLight Worldwide.

**B.     Innerlight buys the assets of InnerLight International and the business expands**

17.     Upon information and belief, on January 10, 2000, Darius International, Inc. ("Darius International ") was incorporated in the State of Delaware. Darius International was a

wholly-owned subsidiary of The Quigley Corporation ("Quigley Corp."). Quigley Corp. (since May, 2010 known as Pro Phase Labs) is a Nevada corporation, with its principal place of business in Doylestown, Pennsylvania. Quigley Corp. n/k/a Pro Phase Labs was and is a microcap publicly traded company which, among other things, markets a product called Cold-EEZE.

18.      Upon information and belief, on December 20, 2000, Darius Marketing Inc. ("Darius Marketing") was incorporated in the State of Delaware. Upon information and belief, Darius Marketing was wholly-owned by Darius International.

19.      Upon information and belief, through Russ and Maryann Green, InnerLight International distributors, the Youngs met Ron Howell. Robert O. Young eventually learned that Mr. Howell was the President of Darius Marketing and that Darius Marketing was looking to purchase MLM companies. Negotiations commenced between the Youngs and Darius International and/or Darius Marketing.

20.      Upon information and belief, on January 15, 2001, InnerLight International, Hikari Holdings, the Youngs, Darius International and Darius Marketing entered into an Asset Purchase Agreement.

21.      Upon information and belief, under the Asset Purchase Agreement, Darius Marketing purchased InnerLight International's assets, including trademarks (such as the trademark "INNERLIGHT"), designs or logos related thereto together with all registered and unregistered names), domain names, insignias, copyrights, product formulations, manufacturing information, trade secrets and other proprietary information related to InnerLight International's nutritional and dietary supplements and related products, together with any then current or future modifications to the products, and inventory, customer lists, equipment, cash, and records.

22.     Upon information and belief, a Doylestown, Pennsylvania attorney, Thomas
MacAniff, Esq. or his law firm represented Darius International and Darius Marketing (which
later changed its name to Innerlight) in the 2001 transaction to acquire the assets of the Youngs'
company. Upon information and belief, Mr. MacAniff served for many years (well before 2001)
as outside general counsel for Quigley Corp., was a shareholder of Quigley Corp. and appeared
of record on behalf of, or coordinated litigation on many occasions involving, Quigley Corp.
and/or Innerlight, including in this action (representing defendants), the Innerlight v. Matrix Utah
State Court Action, the Matrix v. Innerlight Florida Federal Court Action and the Matrix v.
Innerlight Florida State Court Action, all described below, among other lawsuits involving
Quigley Corp. and Innerlight.

23.     Upon information and belief, Mr. MacAniff or his firm have also represented
Quigley Corp. and Innerlight in transactions, including in connection with the Quigley Corp.
Corp./InnerLight Holdings February 29, 2008 Agreement and the subsequent July 18, 2008
InnerLight Holdings IPO, discussed below. Upon information and belief, in that IPO, attorney
William Reilly was hired as SEC counsel at the behest of Mr. MacAniff. Mr. Reilly, like Mr.
MacAniff, long represented Quigley Corp., and, like Mr. MacAniff, was also a shareholder of
Quigley Corp., going back at least as early as the mid-1990s. The status of Mr. MacAniff and
Mr. Reilly as shareholders of The Quigley Corp. is reflected at Quigley Corp.'s Form SB-2/A
(Pre-Effective Amendment to Registration of Securities) filed on September 29, 1997 with the
SEC.

24.     Innerlight also entered into a Consulting Agreement with the Youngs at the same
time the Asset Purchase Agreement was entered into. The Consulting Agreement provided that

the Youngs were to perform certain services and were to be paid a commission of 5% of adjusted gross revenues on sales of products covered by the Asset Purchase Agreement.

25.     Upon information and belief, the Youngs or their corporate designees received in excess of $2,800,000.00 as of approximately November, 2005 from Innerlight (f/k/a Darius Marketing) pursuant to the Consulting Agreement, and have continued thereafter to receive payments pursuant to the Consulting Agreement.

26.     The Youngs also entered into a Non-competition Agreement with Darius Marketing at the same time the Asset Purchase Agreement was entered into.

27.     Upon information and belief, on January 16, 2001, InnerLight International, Inc., Hikari Holdings, the Youngs, Darius International, and Darius Marketing entered into a Post-Closing Agreement, which, among other things, adds "Alkalarian" to the list of trademarks purchased by Darius Marketing, Inc. in the Asset Purchase Agreement.

28.     In March, 2001, Darius Marketing changed its name to Innerlight.

29.     Upon information and belief, also in March of 2001, Stephanie McAnly ("McAnly") joined defendant Innerlight as its Executive Director. She later became the President of Innerlight. Immediately prior to joining Innerlight, she had been the Chief Executive Officer of Beverly Sassoon & Company, a South Florida based skincare and dietary supplement company founded by the family of Vidal Sassoon.

30.     Mr. Brogan had been an independent distributor of InnerLight International before InnerLight International's January 15, 2001 acquisition by Darius Marketing. Thereafter, he became the head independent distributor of Innerlight based out of Sarasota, Florida, and later became the President of Darius International and Innerlight in September of 2006.

31.     Innerlight's web site was www.innerlightinc.com. Innerlight to this day remains the owner and registrant of the domain name "innerlightinc.com". That domain name is being used by defendants InnerLight Holdings and InnerLight Worldwide in the conduct of their "Innerlight" business.

32.     Upon information and belief, virtually all of Innerlight's sales were generated through Innerlight's independent distributors who purchased InnerLight products online through the innerlightinc.com website.

33.     Upon information and belief, on May 30, 2002, Innerlight filed a trademark/service mark application the PTO for the "INNERLIGHT" word mark and design. The purposed of the application was to register the mark on the Principal register and provides notice of Innerlight's claim of ownership of the mark.

34.     Upon information and belief, on February 25, 2003, Innerlight's "INNERLIGHT" word and logo design was registered on the Principal Register by the PTO.

**C.     Innerlight adds "Outer Beauty" products with the acquisition of the Beverley Sassoon line of skin care products**

35.     In or about October, 2004, Matrix and Innerlight entered into an Exclusive Distribution Agreement. The subject matter of the Exclusive Distribution Agreement was the purchase and distribution by Innerlight of Matrix's cosmetics and other products bearing the Beverly Sassoon brand name in all worldwide markets, including the United States (but excluding Asia), in the multi-level marketing and network marketing industries. Ms. McAnly of Innerlight, who signed the Agreement as Innerlight's President, was, of course, well versed with the brand given her tenure as the CEO of Beverly Sassoon & Company immediately prior to joining Innerlight.

36.     The Exclusive Distribution Agreement had a mandatory Florida forum and Florida choice of law clause: "This Agreement shall be construed and interpreted under the laws of the State of Florida and the parties agree that any action or proceeding brought concerning this Agreement may be brought only in the courts of Palm Beach County, Florida."

37.     As a result of acquiring the Beverly Sassoon line of skin care products on an exclusive basis, Innerlight adopted the tag line "Inner Health and Outer Beauty", with "Inner Health" signifying Innerlight's existing ingestible supplements such as Prime pH and Supergreens, and "Outer Beauty" signifying the new Beverly Sassoon topical skin care line of products. The tag line "Inner Health and Outer Beauty" has remained with the "Innerlight" business to this day.

38.     Innerlight also changed its website to feature, on the front page, the Beverly Sassoon product line. A true copy of a portion of the Innerlight website from 2005 devoted to the Beverly Sassoon products is attached hereto as Composite Exhibit "1". This was the Innerlight "home page" of Mr. Brogan, at that time Innerlight's top independent distributor, and accessed (at that time) through the Innerlightinc.com website with content created and approved by Innerlight. The home page of Mr. Brogan at that time could be found at www.Innerlightinc.com/kb the "kb" standing for Kevin Brogan. Other Innerlight distributors could, and did, have their own Innerlight home pages accessed through the www.innerlightinc.com website, all with the same Innerlight-created Beverly Sassoon content.

39.     Innerlight repeatedly touted that it was the exclusive distributor of the Beverly Sassoon product line, and this "exclusivity" angle was a crucial part of the marketing of the line by Innerlight, a fact confirmed through the deposition testimony of non-party witness, Bill Holderby, a former National Director of Innerlight, who was held in such high esteem at

Innerlight that a photograph of him prominently hung on the wall at Innerlight's offices. Mr.

Holderby's deposition was taken on October 27, 2010 in the <u>Matrix v. Innerlight</u> Florida State

Court Action, described below.

40.     Under the Exclusive Distribution Agreement, Innerlight was obligated to purchase

specific minimum purchase amounts of Beverly Sassoon products during each year of the term

of the Agreement, which was to end on October 17, 2013. This is defined at paragraph 5 thereof

as the "Minimum Purchase Requirement". For the period from October 18, 2004 through

October 17, 2005, Innerlight was obligated to purchase $750,000 of Beverly Sassoon products

from Matrix. For the period from October 18, 2005 through October 17, 2006, Innerlight was

obligated to purchase $1,500,000 of Beverly Sassoon products from Matrix. For the period from

October 18, 2006 through October 17, 2013, Innerlight was obligated to purchase $4,000,000 of

Beverly Sassoon products each year from Matrix. Such product purchase requirements are

broken down into quarterly obligations with Innerlight being obligated to purchase a pro rata

amount of the yearly minimum purchase requirement of products during each specified quarter.

**D.    Innerlight breaches the Exclusive Distribution Agreement**

41.     Innerlight breached the Exclusive Distribution Agreement by failing to purchase

the minimum required amounts of Beverly Sassoon products. Specifically, between October 18,

2004 and October 17, 2005, Innerlight only purchased $289,250.00 of such products from

Matrix, leaving Innerlight in default of meeting its minimum purchase obligations for such

period by the amount of $460,750.00. Subsequent to October 17, 2005, Innerlight purchased only

$5,950.00 of such products from Matrix. Inasmuch as Innerlight was obligated to purchase a

minimum of $750,000 of such products from Matrix during the period between October 18, 2005

and April 17, 2006, Innerlight was in default in purchasing such products from Matrix by the

10

additional amount of $744,050.00 during the period from October 18, 2005 through April 17, 2006. Thereafter, in accordance with the "Minimum Purchase Requirement" set forth in the Agreement, Innerlight had the obligation to purchase $28,750,000.00 of such products from Matrix during the period from April 18, 2006 through October 17, 2013.

42.     On December 15, 2005, over a year into the life of the Exclusive Distribution Agreement, Mr. Guy Quigley (the then Chairman, President and CEO of Quigley Corp.) wrote to Matrix venturing his opinion that Matrix and Innerlight did not in fact have a contract -- but then, conveniently, proposing that the parties enter into a new contract.

43.     On June 1, 2006, six weeks *after* it had sued preemptively Matrix, as described below, but not before it tried to dump its remaining Beverly Sassoon inventory on its unsuspecting distributors, Innerlight announced, by email, to its own distributors that it would, effective that day, discontinue the Beverly Sassoon product line.

**E.     Innerlight preemptively sues Matrix in Utah State Court**

44.     On or about March 13, 2006, about eighteen months into the life of the Exclusive Distribution Agreement and in contravention of the Agreement's mandatory Florida forum selection clause, Innerlight filed a preemptive 1½ page Complaint against Matrix in Utah state court, specifically, the Fourth District Court, Provo, Utah, Case No. 060400775 (the, "Innerlight v. Matrix Utah State Court Action"), wherein Innerlight requested a declaratory judgment that Matrix and Innerlight had not entered into a valid contract. Innerlight described the Exclusive Distribution Agreement as an "executory contract" and claimed that a condition precedent to the formation of a contract had not been satisfied by Matrix. This was a bogus excuse to attempt a unilateral termination of the Agreement. In fact, Robert Young had been critical of Innerlight's Beverly Sassoon line of products, and, as a result, Innerlight had lost sales and had essentially

11

stopped marketing the line. This was a finding of fact of Judge Mary A. McLaughlin in that certain action entitled Darius International, Inc. and Innerlight, Inc. v. Robert O. Young, et al., Case No. 05-6184, United Stated District Court for the Eastern District of Pennsylvania. Upon information and belief, that finding was made based upon evidence presented by Darius International and Innerlight.

45.     Mr. MacAniff represented Innerlight, together with Utah local counsel, in the Innerlight v. Matrix Utah State Court Action.

46.     On March 28, 2006, Innerlight filed an Amended Complaint, this time describing the Exclusive Distribution Agreement as a "contingent agreement".

47.     On or about April 20, 2006, Matrix filed a motion to dismiss the Amended Complaint under Utah Rule Civ. P. 12(b)(3), with supporting memorandum of law, arguing that venue was improper based upon the Exclusive Distribution Agreement's mandatory Florida forum selection clause.

48.     On or about July 13, 2006, the Court held a hearing on Matrix's motion to dismiss for improper venue, at which time the Court announced that the motion was denied.

49.     On or about July 21, 2006, Matrix filed its answer and counterclaim. The answer included the defenses of lack of personal and subject matter jurisdiction based upon the Exclusive Distribution Agreement's mandatory Florida forum selection clause. Pursuant to Rule 13(a) of the Utah Rules of Civil Procedure, and out of an abundance of caution (so Innerlight could not argue Matrix waived its right to bring counterclaims), Matrix also asserted a compulsory counterclaim for breach of contract against Innerlight (however none of Matrix's motions or arguments throughout the Innerlight v. Matrix Utah State Court Action argued the underlying merits of the case or Matrix's counterclaims; rather, Matrix's arguments throughout

that action sought to enforce the forum selection clause, thereby affording the parties their day in court in Florida on the merits.

50.     On or about August 2, 2006, the Court entered its Order denying Matrix's motion to dismiss.

51.     On or about September 11, 2006, Innerlight filed a motion for summary judgment, which argued that the Exclusive Distribution Agreement was an "unenforceable executory agreement" and requesting to be ordered to return the unused products to Matrix for a full refund of the purchase price.

52.     On or about September 19, 2006, Matrix filed its motion for summary judgment and supporting memorandum of law, on the grounds of lack of personal and subject matter jurisdiction, based upon the Exclusive Distribution Agreement's Florida forum selection clause.

53.     On or about January 17, 2007, the Court heard oral argument on the parties' respective summary judgment motions (as well as motions to strike affidavits). At the hearing, the trial court ruled from the bench and granted Innerlight's motion, denied Matrix's motion, granted Innerlight's motion to strike, and denied Matrix's motion to strike.

56.     On or about April 16, 2007, the Court entered its Order Granting Summary Final Judgment in favor of Innerlight and denying Matrix's summary judgment motion. As sought *by Innerlight*, the Order also required Innerlight to ship all Beverly Sassoon products in its possession back to Matrix, and in return, Matrix had to return the full purchase price to Innerlight within fifteen days of shipment by Innerlight.

57.     On or about April 20, 2007, Matrix filed a Rule 62(d) motion to stay the judgment, which was opposed by Innerlight. The trial court declined to grant the motion unless

Matrix agreed to post a supersedeas bond for the amount Matrix was supposed to refund to Innerlight.

58.     On May 2, 2007, Matrix appealed, among other ruling, the order granting Innerlight's summary judgment motion, which appeal was Case No. 20070425 in the Utah Supreme Court.

59.     On or about June 25, 2007, the Court entered a Judgment in favor of Innerlight pursuant to the April 16, 2007 Order Granting Summary Final Judgment in favor of Innerlight.

60.     On or about July 26, 2007, Innerlight filed an Application for Writ of Execution, a Writ of Execution, and a Praecipe and on or about August 2, 2007 served the same upon Matrix in Florida (not upon Matrix's Utah counsel) seeking to execute on Matrix's "chose in action". The chose in action Innerlight sought to execute upon was Matrix's appeal in the Utah Supreme Court.

61.     On or about August 23, 2007, Matrix requested a hearing on the writ and moved to stay the writ, but the trial court held that Matrix's request untimely and then denied the motion to stay, thereby allowing Innerlight to proceed to execute on Matrix's chose in action.

62.     On or about September 18, 2007, Matrix filed its notice of appeal on the trial court's ruling that (1) Matrix's request for a hearing was untimely and (2) denying Matrix's motion to stay the writ of execution.

63.     On or about September 25, 2007, Matrix turned to the Utah Supreme Court for emergency relief with the filing of a Rule 8A petition and a motion to stay the judgment and writ of execution.

64.     On or about October 9, 2007, the Utah Supreme Court granted Matrix's petition as well as the motion to stay.

65.     On or about on November 5, 2007, Matrix moved before the Utah Supreme Court to consolidate the first appeal (on the trial court's summary judgment rulings) and the second appeal (on the writ of execution).

66.     On or about on November 6, 2007, the Utah Supreme Court granted Matrix's November 5, 2007 motion to consolidate.

67.     On June 5, 2009, the Utah Supreme Court issued it decision adverse to Innerlight, holding that the Exclusive Distribution Agreement's Florida forum selection and Florida choice of law provisions were enforceable. The decision is published at *Innerlight, Inc. v. The Matrix Group, LLC*, 214 P.3d 854 (Utah 2009). The Utah Supreme Court reversed the grant of summary judgment in favor of Innerlight and found that "Innerlight and Matrix entered into a valid and binding agreement" and that the trial court "erred by denying Matrix's motion to dismiss and subsequently erred in granting Innerlight's motion for summary judgment." The Supreme Court "vacate[d] the district court's order and remand[ed] [the case] to the district court for further proceedings consistent with this opinion." A true copy of the decision is attached hereto as Exhibit "2".

68.     On or about January 15, 2010, in the trial court of the <u>Innerlight v. Matrix</u> Utah State Court Action, Matrix filed its motion for attorneys' fees with supporting memorandum of law.

69.     On or about March 3, 2010, Innerlight filed its memorandum of law in opposition to Matrix's motion for attorneys' fees, arguing that the trial court was without jurisdiction in light of the Utah Supreme Court's decision; that that decision did not address either parties' (Matrix or Innerlight) rights under the Exclusive Distribution Agreement, but only decided that

the proper venue was Florida; and that the merits of the dispute and the issue of fees would have to be decided by a Florida court.

70.     On or about March 23, 2010, Matrix filed its reply memorandum in support of its motion for attorneys' fees.

71.     On or about May 18, 2010, the Court entered its ruling which denied Matrix's motion for attorneys' fees. The Court held that it was without jurisdiction to award fees; that fees could not awarded to a prevailing party because there was no prevailing party in that neither party had presented its claims or defenses; and that "[t]he merits of the case and whether an award of fees is appropriate will be decided by a Florida court." That ruling is presently on appeal to the Utah Supreme Court.

**F.    Matrix files a breach of contract lawsuit against Innerlight in Florida federal court, but is thwarted by the first-filed rule**

72.     On July 6, 2006, Matrix -- following Innerlight's preemptive Utah state court action -- filed an action against Innerlight in the United States District Court of the Southern District of Florida for breach of Exclusive Distribution Agreement (the, "The Matrix v. Innerlight Florida Federal Court Action").

73.     On or about July 14, 2006, Innerlight filed a motion to stay the action or to transfer it to the Utah State Court in the Innerlight v. Matrix Utah State Court Action based upon the first-filed rule (the, "Stay Motion"). Innerlight was represented by Paul Lopez of the Fort Lauderdale, Florida law firm of Tripp Scott.

74.     On or about July 14, 2006, Innerlight filed a motion for an enlargement of time to respond to the Complaint until after the resolution of the stay motion. Matrix did not object to the motion.

16

75.     On or about July 28, 2006, Matrix filed its response to the Stay Motion. Matrix did not oppose the stay request but did oppose the motion to transfer the case to the Utah State Court.

76.     On or about August 8, 2006, Innerlight filed its reply to Matrix's response to the Stay Motion, in which Innerlight argued that although Innerlight had requested a stay or transfer in the Stay Motion, the Court should actually dismiss the action under the first-filed rule instead because in the interim the Court in the Innerlight v. Matrix Utah State Court Action had denied Matrix's motion to dismiss and that Matrix had filed a counterclaim in that action. At the same time, Innerlight filed the transcript of the July 13, 2006 hearing before the Utah State Court on Matrix's motion to dismiss for improper venue, which the Utah State Court had denied.

77.     On or about August 24, 2006, Innerlight filed a motion for that Court to take judicial notice of the transcript of the July 13, 2006 hearing in the Innerlight v. Matrix Utah State Court Action on Matrix's motion to dismiss and the subsequent written August 2, 2006 Order denying Matrix's motion to dismiss.

78.     On or about September 6, 2006, Matrix filed its response to Innerlight's motion for the Court to take judicial notice.

79.     On or about September 11, 2006, Innerlight filed its reply to Matrix's response to a motion for the Court to take judicial notice. Among other things, Innerlight argued that: "Matrix fails to show that it would be prevented from re-filing in the courts of Palm Beach County after prevailing on a motion for summary judgment in the Utah Action if it voluntarily dismissed the above-captioned action."

80.     On or about October 2, 2006, the Court entered an Order granting Innerlight's Stay Motion (the, "Stay Order").

81.     On October 4, 2006, the court entered an Order staying the action. A true copy of the Order is attached hereto as Exhibit "3".

82.     On or about December 19, 2006, the parties filed a status report of the <u>Innerlight v. Matrix</u> Utah State Court Action as required by the Stay Order. The parties advised the Court of the then pending summary judgment motions filed in the Utah State Action and requested that the Court extend the stay for an addition period of 90 days from December 29, 2006 or until the summary judgment motions filed in the Utah State Court Action were ruled upon.

83.     On or about December 28, 2006, the Court entered an Order granting the parties' motion to extend the stay. The stay was extended for an additional 90 days from the date of the order, or until such time as the Utah State Court ruled on the summary judgment motions, whichever was sooner. The parties were also required to provide the Court within an update within 90 days.

84.     On or about March 26, 2007, the parties filed their second joint status report and further request for a stay, advising the Court that a hearing was held on January 17, 2007 in the <u>Innerlight v. Matrix</u> Utah State Court Action on the parties' respective summary judgment motions, at which time the Utah State Court granted Innerlight's motion and denied Matrix's motion. The parties requested a further 90-day stay from March 27, 2007.

85.     On March 28, 2007, the Court entered an Order granting the parties' second stay motion and extended the stay until June 27, 2007, or until such time as the summary judgment order in the Utah State Court Action had been reduced to writing, which occurred first.

86.     On or about May 3, 2007, Innerlight filed a motion to dismiss in which Innerlight noted that the Court in the <u>Innerlight v. Matrix</u> Utah State Court Action had entered summary judgment in Innerlight's favor in April 16, 2007, and argued that Matrix had conceded to the

jurisdiction of the Utah State Court and that the Court should dismiss the action under the first-filed rule.

87.     On or about June 19, 2007, Matrix filed a notice of voluntary dismissal without prejudice.

88.     On or about June 26, 2007, the Court entered an Order closing the case.

89.     The Matrix v. Innerlight Florida Federal Court Action was actively litigated by Innerlight, by and through its attorneys, Paul Lopez and George Walker and their firm, Tripp Scott.

> **G.     In the window of time between Innerlight's victory in the Utah State District Court and Innerlight's defeat in the Utah Supreme Court, InnerLight Holdings is formed and strips Innerlight's assets**
>
> > 1.     InnerLight Holdings becomes the owner of Innerlight

90.     On February 29, 2008, Guy Quigley, Brogan and other Quigley Corp. insiders caused Quigley Corp. to sell Darius International (which wholly owned Innerlight) to InnerLight Holdings in a stock sale for the bargain price of $1 million. This was less than the cash on hand at Innerlight (or Darius International).

91.     To effectuate the transaction, Mr. Brogan (who was the President of both Darius International and Innerlight) and other Quigley Corp. insiders caused the formation of defendant InnerLight Holdings on February 21, 2008. This entity was created solely for the purpose of acquiring the Innerlight business through the acquisition of Darius International. At that time, the insiders also caused the formation of defendant InnerLight Worldwide to serve as the entity to control the Innerlight website and to serve as the supplier of Innerlight products to the independent distributors of Innerlight products and as liaison to those distributors. Gary Quigley, the brother of the Quigley CEO, Guy Quigley, is a major owner of InnerLight Holdings. Quigley Corp. sold Darius International just as it had started being profitable. The SEC Registration

Statement filed by Innerlight Holdings, discussed below, Darius's net income was $139,263 for the first two months of 2008 (i.e., pre-sale), and its subsequent net income for the remaining ten months of 2008 was $1.3 million. This income was generated by the Innerlight business.

92.     The stock sale of Innerlight from Quigley Corp. to InnerLight Holdings was pursuant to a February 29, 2008 written Agreement between those companies. Paragraph 5 of that Agreement provides:

> InnerLight Holdings specifically represents and warrants to The Quigley Corporation that it is purchasing the stock with full knowledge that Darius International Inc. may be insolvent, that there are claims against Darius International Inc. and its subsidiaries, contingent or otherwise, which could render Darius International Inc. or its subsidiaries insolvent, that Quigley makes no representation that any **litigation currently pending** against Darius International Inc. or its subsidiaries including, but not limited to, actions involving Robert O. and Shelley Young, **Matrix Inc.**, and ReadyCash Inc. will not result in adverse judgments against Innerlight Inc., a wholly-owned subsidiary of Darius International Inc. or Darius, which could cause Darius to become insolvent. (Emphasis supplied).

93.     Upon information and belief, the reference to "Matrix Inc." at paragraph 5 of the February 29, 2008 Agreement between Quigley Corp. and InnerLight Holdings refers to Matrix and the "litigation currently pending" involving "Matrix Inc." referred to therein obviously refers to the only lawsuit then pending between Innerlight and Matrix, namely the <u>Innerlight v Matrix</u> Utah State Court Action, which on February 29, 2008 had the pending appeal by Matrix before the Utah Supreme Court.

94.     A true and accurate copy of the February 29, 2008 Agreement between Quigley Corp. and InnerLight Holdings is attached hereto as Exhibit "4". Guy Quigley signed the Agreement for Quigley Corp. and Mr. Brogan signed the Agreement for InnerLight Holdings and Darius International.

20

95.     Upon information and belief, during Quigley Corp.'s seven year ownership of Innerlight, Innerlight generated approximately $111,616,961 in aggregate revenues. As Quigley itself reported to the SEC, Darius International had sales revenue of approximately $15.3 million in 2006 and $11.2 million in 2007 from Innerlight sales.

96.     Upon information and belief, on or about September 28, 2006, Quigley Corp. had received a proposal from an investor group headed by Irving Rill of the Ameril Corporation to purchase Innerlight or its principal assets for $10 million in cash. The offer was rejected by Guy Quigley, the then President of Quigley Corp. Instead, Guy Quigley and Mr. Brogan developed a scheme to acquire Innerlight from Quigley Corp., through the vehicle of InnerLight Holdings, for a fraction of its true value for their own benefit and for the benefit of Quigley family and friends.

97.     Upon information and belief, the day the sale closed, Innerlight (or Darius International, based upon Innerlight's business) had cash assets of $1,244,883.44. The cash on hand at Innerlight (or Darius International) exceeded the cash purchase price by $244,883.

98.     Up until the sale of Innerlight to InnerLight Holdings, Innerlight was a very valuable asset of Quigley Corp. As a result of the sale, a proxy fight ensued resulting in the resignation of Guy Quigley as the President and Prophase Labs, Inc. (f/k/a Quigley Corp.) filed suit against Mr. Brogan, InnerLight Holdings, Guy Quigley and others for breach of the duty of loyalty, civil conspiracy and unjust enrichment in in the Court of Common Pleas of Bucks County, Pennsylvania, Case No. 201008227. The case remains pending.

99.     Upon information and belief, in 2008, the same year it was sold to InnerLight Holdings for $1 million, the Innerlight business recorded a net profit $2.7 million, more than two and one-half times the entire sales price. Recognizing that they had acquired a highly valuable business from Quigley Corp., the principals of InnerLight Holdings -- former Quigley Corp.

21

insiders, including Mr. Brogan -- initiated a plan to *very* quickly take InnerLight Holdings public in 2008.

2.  <u>InnerLight Holdings undertakes an IPO without revealing the existence of the then pending Matrix appeal before the Utah Supreme Court, despite inquiry by the SEC</u>

100.    Upon information and belief, less than six months after the purchase of Innerlight's shares, InnerLight Holdings, through an initial public, began to raise money at a valuation greater than $10 million.

101.    Upon information and belief, on or about July 18, 2008, defendant InnerLight Holdings filed a Registration Statement with Prospectus with the SEC for a proposed initial public offering of its common stock. A true copy of the Registration Statement (without exhibits) is attached hereto as Exhibit "5".

102.    The InnerLight Holdings Registration Statement reported net sales of $2,188,000 million and income from operations of $131,369 for Innerlight for the first two months of 2008 before the February 29, 2008 stock sale and net sales of $14,556,000 and income from operations of $2.507 million for InnerLight Holdings for the remainder of 2008 after the sale. Furthermore, InnerLight Holdings assumed the existing liabilities of Innerlight:

> InnerLight International, Inc., the predecessor of our operating subsidiary, was established in 1998. In January, 2001, the Quigley Corporation purchased InnerLight International's assets for the purpose of providing an alternative distribution channel for our products. The company was named Darius Marketing, Inc. In March of 2002, management of the Company changed the name to InnerLight, Inc. In February, 2008, all of the capital stock of InnerLight, Inc. was purchased from The Quigley Corporation by InnerLight Holdings, a newly-formed corporation, for $1,000,000 ***and the assumption of the existing liabilities of InnerLight, Inc.***
> (Emphasis supplied)

*See* Registration Statement, Exhibit "5" at pages 4 and 16 of the Prospectus (pages 7 and 21 of the PDF)". A true copy of the Registration can also be found at:

http://www.sec.gov/Archives/edgar/data/1435738/000109690608001371/innerlights1.ht

m.

103.    At page F-10 of the Prospectus (page 61 of the PDF) InnerLight Holdings'

assumption of the existing liabilities of Innerlight is reiterated:

> On February 23, 2008, the company acquired InnerLight, Inc. from its
> shareholder in an agreement for $1,000,000 **and the assumption of the existing**
> **liabilities of InnerLight, Inc.** InnerLight, Inc. is a distribution channel for health
> and related products. The integration of InnerLight, Inc. with the Company's
> existing operations will provide worldwide assistance to its sales associates.
> (Emphasis supplied)

104.    The Prospectus to InnerLight Holdings' Registration Statement refers to

Innerlight as the predecessor to InnerLight Holdings. *See* Exhibit "5" at pages 34 and 37 of the

Prospectus (pages 42 and 45 of the PDF).

105.    The Prospectus also represents that the "corporate web" site is

www.innerlightcorp.com. This is referenced at page 4 of the Prospectus (page 7 of the PDF).

106.    The Registration Statement was executed by Mr. Brogan as CEO, President, and

Chief Executive Officer of InnerLight Holdings.

107.    InnerLight Holdings' Registration Statement was also executed by Mr. Heber

Maughan as Secretary and Principal Financial Officer of InnerLight Holdings.

108.    On July 25, 2008, the SEC wrote to Mr. Brogan in which the SEC stated in part:

"We note that InnerLight Holdings Inc (ILH), a newly-formed corporation, acquired InnerLight,

Inc (IL) from The Quigley Corp on February 23, 2008 for $1.0 million and the assumption of

existing liabilities of IL." A true copy of the SEC's July 25, 2008 letter to Mr. Brogan is attached

hereto as Exhibit "6".

109.     On or about November 12, 2008, defendant InnerLight Holdings filed Amendment No. 1 to its Registration Statement with the SEC, a true copy of which (without exhibits) is attached hereto as Exhibit "7".

110.     InnerLight Holdings' Amendment No. 1 to its SEC Registration Statement repeats the representation that InnerLight Holdings assumed the existing liabilities of Innerlight. These are contained at pages 4, 16 and F-10 of the Prospectus (pages 9, 29 and 78 of the PDF). InnerLight Holdings also repeats also repeats its reference to Innerlight as its predecessor. *See* Exhibit "7" at pages 34 and 37 of the Prospectus (pages 42 and 45 of the PDF).

111.     On December 11, 2008, the SEC wrote to InnerLight Holdings asking, among other things, that InnerLight Holdings correct its website address to www.innerlightinc.com. A true copy of this letter can be found at: http://www.sec.gov/Archives/edgar/data/1435738/000000000008061068/filename1.pdf.

112.     Upon information and belief, on or about November 12, 2008, defendant InnerLight Holdings filed Amendment No. 2 with the SEC. One of the amendments made was to change the reference to the "corporate website" from www.innerlightcorp.com to www.innerlightinc.com, which had been Innerlight's web site.

113.     A true copy of the Amendment No. 2 to Registration Statement (without exhibits) is attached hereto as Exhibit "8". A true copy of the Amendment can also be found at: http://www.sec.gov/Archives/edgar/data/1435738/000109690609000027/innerlights1a2.htm.

114.     InnerLight Holdings' Amendment No. 2 to its SEC Registration Statement repeats the representation that InnerLight Holdings assumed the existing liabilities of Innerlight and also refers to Innerlight as its predecessor.

115.     The Registration Statement Amendment No. 2 was executed by Mr. Brogan as CEO, President, and Chief Executive Officer of InnerLight Holdings and Mr. Heber Maughan as Secretary and Principal Financial Officer of InnerLight Holdings.

116.     On January 30, 2009, the SEC wrote to Mr. Brogan asking, among other things, for InnerLight Holdings to "clarify the number of DSAs that are currently selling your products". This is comment No. 8 in the SEC letter, a true copy of which can be found at http://www.sec.gov/Archives/edgar/data/1435738/000000000009005056/filename1.pdf. "DSAs" stands for Direct Sales Associates and refers to the Innerlight independent distributors.

117.     On February 11, 2009, defendant InnerLight Holdings filed amendment No. 3 to its Registration Statement with the SEC. At page 18 of the prospectus contained therein, InnerLight Holdings, for the first time, represented that it "presently has 151,000 DSAs active in the US [sic] and foreign countries." Upon information and belief, all or a vast majority of these distributors were Innerlight's distributors. InnerLight Holdings also repeats states that it has assumed the existing liabilities of Innerlight.

118.     A true copy of InnerLight Holdings Amendment No. 3 to its Registration Statement (without exhibits) is attached hereto as Exhibit "9". A true copy can also be found at: http://www.sec.gov/Archives/edgar/data/1435738/000109690609000095/innerlights1a3.htm.

119.     InnerLight Holdings' reference to its 151,000 DSAs is found at page of Prospectus filed with Amendment No. 3 at page 18 of the Prospectus (page 28 of the PDF):

> The Company is a direct sales company, which presently distributes its products through a network marketing system. Under its system, DSA's purchase products from the Company for resale and for personal consumption. The DSA's join the company for a fee of $25 in the USA ($30 outside the USA). Their DSA agreement gives them the right to purchase products at wholesale, and then sell retail to others or share the business opportunity with others. The Company presently has 151,000 DSAs active in the US and foreign countries.

120.     Registration Statement Amendment No. 3 was executed by Mr. Brogan as CEO, President, and Chief Executive Officer of InnerLight Holdings and Mr. Heber Maughan as Secretary and Principal Financial Officer of InnerLight Holdings.

121.     On March 2, 2009, the SEC issued wrote to InnerLight Holdings, requesting, among other things, that InnerLight Holdings provide a clear disclosure of the current consulting agreement/arrangement between Robert Young and InnerLight Holdings and requesting the filing of any written agreement as an exhibit. The SEC also stated at comment 12:

> In addition, we note that the Quigley Corp. Purchase Agreement refers to litigation regarding your wholly-owned subsidiary, Darius that could cause it to become insolvent. These claims appear to be separate from the lawsuit Quigley Corp. filed against Mr. Young. Please explain whether these claims are continuing or whether they have been settled. To the extent they continue, provide the disclosure required by Item 103 of Regulation S-K. We may have further comments.

A true copy of the SEC letter to InnerLight Holdings as Exhibit "10". A true copy of the letter can also be found at:

http://www.sec.gov/Archives/edgar/data/1435738/000000000009011106/filename1.pdf.

122.     The SEC reference to litigation referenced in the Quigley Corp. Purchase Agreement is to paragraph 5 of the Quigley Corp./InnerLight Holdings February 29, 2008 Agreement. The claims referred to by the SEC included the Matrix claim represented by Matrix's then pending appeal the Utah Supreme Court. This is obviously so given the reference to Matrix at paragraph 5 of the February 29, 2008 Agreement.

123.     On March 23, 2009, defendant InnerLight Holdings filed Amendment No. 4 to its Registration Statement with the SEC. Therein, InnerLight Holdings attached as an exhibit the January 15, 2001 Consulting Agreement between Darius Marketing (which became Innerlight) and the Youngs described above. InnerLight Holdings also repeats that it has assumed the existing liabilities of Innerlight and again refers to Innerlight as its predecessor. A true copy of

InnerLight Holdings' Amendment No. 4 to its Registration Statement (without exhibits) is

attached hereto as Exhibit "11". This Amendment also can be found at:

http://www.sec.gov/Archives/edgar/data/1435738/000109690609000228/innerlights1a4.htm.

124.    Registration Statement Amendment No. 4 was executed by Mr. Brogan as CEO,

President, and Chief Executive Officer of InnerLight Holdings and Mr. Heber Maughan as

Secretary and Principal Financial Officer of InnerLight Holdings.

125.    On April 10, 2009, the SEC issued written comments to Mr. Brogan regarding

InnerLight Holdings' Amendment No. 4 to its Registration Statement, stating, among other

things:

> Legal Proceedings, page 21
>
> 4.    With respect to comment 12 from our March 2, 2009 letter, we reissue
> part of that comment. <u>It appears there is *another* lawsuit, separate from the
> one involving Dr. Young. We again note that the purchase agreement
> refers to litigation regarding Darius that could cause it to become
> insolvent. As previously requested, *please explain whether the claims are
> continuing or whether they have been settled*</u>.
> (Emphasis supplied).

A true copy of the SEC letter to InnerLight Holdings as Exhibit "12". This correspondence can

also be found at:

http://www.sec.gov/Archives/edgar/data/1435738/000000000009018904/filename1.pdf.

126.    Upon information and belief, the reference to "another lawsuit" refers the

<u>Innerlight v. Matrix</u> Utah State Court Action, then on appeal to the Utah Supreme. Upon further

information and belief, InnerLight Holdings never responded to the above quoted portion of the

SEC's March 2, 2009 comment or the SEC's follow-up request of April 10, 2009. InnerLight

Holdings deliberately chose not to explain whether claims were continuing or whether they had

been settled, as specifically requested by the SEC.

127.    On April 16, 2009, in connection with the filing of InnerLight Holdings'

Amendment No. 5, Mr. Maughan of InnerLight Holdings wrote to the SEC, responding

specifically to the above-quoted portion of the SEC's April 10, 2009 letter with the following:

> 4.    Please see revision of Legal Proceedings on page 21. The litigation
> referred to in the purchase agreement was two actions commenced by the
> Company's predecessor [Innerlight] as Plaintiff. Both actions were
> discontinued prior to the acquisition of the predecessor. The only litigation
> which continued was the Young action (in which the predecessor was also
> the Plaintiff), and that action was settled in November 2008 on terms
> advantageous to the Company. As disclosed, the Company is not involved
> in any legal proceedings, nor are any anticipated.

A true copy of Mr. Maughan to the SEC is attached hereto as Exhibit "13". A true copy

of the letter can also be found at:

http://www.sec.gov/Archives/edgar/data/1435738/000109690609000424/filename9.htm.

128.    Upon information and belief, Innerlight Holding deliberately never revealed to the

SEC the existence of the Innerlight v. Matrix Utah State Court Action and Matrix's then pending

appeal in the Utah Supreme Court.

129.    On or about April 16, 2009, defendant InnerLight Holdings filed Amendment No.

5 to its Registration Agreement with the SEC, a true copy of which (without exhibits) is attached

hereto as Exhibit "14". This Amendment also can be found at:

http://www.sec.gov/Archives/edgar/data/1435738/000109690609000424/innerlights1a5.htm.

130.    InnerLight Holdings reiterated in Amendment No. 5 to its Registration Agreement

that InnerLight Holdings assumed the existing liabilities of Innerlight and that Innerlight is its

predecessor.

131.    Registration Statement Amendment No. 5 was executed by Mr. Brogan as CEO,

President, and Chief Executive Officer of InnerLight Holdings and Mr. Heber Maughan as

Secretary and Principal Financial Officer of InnerLight Holdings.

132.    On or about April 23, 2009, InnerLight Holdings filed its Amendment No. 6 to its Registration Statement with the SEC. A true copy can be found at: http://www.sec.gov/Archives/edgar/data/1435738/000109690609000434/innerlights1a6.htm.

134.    On or about May 13, 2009, InnerLight Holdings filed its Amendment No. 7 to its Registration Statement with the SEC. A true copy can be found at http://www.sec.gov/Archives/edgar/data/1435738/000109690609000496/innerlights1a7.htm.

135.    InnerLight Holdings filed its Amendment No. 7 to its Registration Statement reiterates that InnerLight Holdings assumed the existing liabilities of Innerlight and that Innerlight is its predecessor.

136.    Registration Statement Amendment No. 7 was executed by Mr. Brogan as CEO, President, and Chief Executive Officer of InnerLight Holdings and Mr. Heber Maughan as Secretary and Principal Financial Officer of InnerLight Holdings.

137.    On or about June 8, 2009, InnerLight Holdings filed its Amendment No. 8 to its Registration Statement with the SEC. A true copy can be found at: http://www.sec.gov/Archives/edgar/data/1435738/000109690609000647/innerlights1a8.htm.

138.    InnerLight Holdings filed its Amendment No. 8 to its Registration Statement reiterates that InnerLight Holdings assumed the existing liabilities of Innerlight and that Innerlight is its predecessor.

139.    Registration Statement Amendment No. 8 was executed by Mr. Brogan as CEO, President, and Chief Executive Officer of InnerLight Holdings and Mr. Heber Maughan as Secretary and Principal Financial Officer of InnerLight Holdings.

140.    InnerLight Holdings' Amendment No. 8 to its Registration Statement did not disclose the June 5, 2009 decision of the Utah Supreme Court in *Innerlight, Inc. v. The Matrix Group, LLC*, 214 P.3d 854 (Utah 2009).

141.    On or about June 13, 2009, Guy Quigley resigned as Chairman, President and CEO of The Quigley Corp. immediately following a proxy contest which culminated on May 20, 2009 at Quigley Corp.'s annual meeting which meeting favored dissident shareholder Ted Karkus and his proposed slate of directors. At the time, The Quigley Corp. also accepted the resignation of COO Charles A. Phillips and Wendy D. Quigley, the Accounting Operations Manager, and Mr. MacAniff's tenure as outside general counsel ended.

142.    On or about June 22, 2009, InnerLight Holdings filed its Amendment No. 9 to its Registration Statement with the SEC. A true copy can be found at:

http://www.sec.gov/Archives/edgar/data/1435738/000109690609000693/innerlights1a9.htm.

143.    InnerLight Holdings' Amendment No. 9 to its Registration Statement reiterated that InnerLight Holdings assumed the existing liabilities of Innerlight and that Innerlight is its predecessor.

144.    Registration Statement Amendment No. 9 was executed by Mr. Brogan as CEO, President, and Chief Executive Officer of InnerLight Holdings and Mr. Heber Maughan as Secretary and Principal Financial Officer of InnerLight Holdings.

145.    InnerLight Holdings' June 22, 2009 Amendment No. 9 to its Registration Statement did not disclose the June 5, 2009 decision of the Utah Supreme Court in *Innerlight, Inc. v. The Matrix Group, LLC*, 214 P.3d 854 (Utah 2009).

146.    On or about July 8, 2009, InnerLight Holdings filed its Amendment No. 10 to its Registration Statement with the SEC. A true copy can be found at:

http://www.sec.gov/Archives/edgar/data/1435738/000109690609000764/innerlights1a10.htm#b
usiness.

147.     InnerLight Holdings' Amendment No. 10 to its Registration Statement reiterated
that InnerLight Holdings assumed the existing liabilities of Innerlight and that Innerlight is its
predecessor.

148.     Registration Statement Amendment No. 10 was executed by Mr. Brogan as CEO,
President, and Chief Executive Officer of InnerLight Holdings and Mr. Heber Maughan as
Secretary and Principal Financial Officer of InnerLight Holdings.

149.     InnerLight Holdings' July 8, 2009 Amendment No. 10 to its Registration
Statement did not disclose the June 5, 2009 decision of the Utah Supreme Court in *Innerlight,
Inc. v. The Matrix Group, LLC*, 214 P.3d 854 (Utah 2009).

150.     Upon information and belief, InnerLight Holdings never obtained authorization to
trade its stock publicly.

### H.    Matrix is -- at long last -- able to seek judicial relief against Innerlight in Florida

151.     The decision of the Utah Supreme Court in the <u>Innerlight v. Matrix</u> Utah State
Court Action removed Matrix's legal impediment to bringing action against Innerlight under
Florida law (the choice of law of Matrix and Innerlight) in Palm Beach County, Florida (the
parties' selected forum) for breach of Exclusive Distribution Agreement. Innerlight's preemptive
Utah state court action had delayed Matrix's ability to do so by approximately three years.

152.     On or about January 15, 2010, Matrix filed a breach of contract action against
Innerlight in Palm Beach County State Circuit Court, Case No. 502010CA001079XXXXMB
(hereinafter, the "<u>Matrix v. Innerlight</u> Florida State Court Action"). Innerlight defended the suit

with the identical argument posited in Utah: that the parties did not form a contract because Matrix had not fulfilled a condition precedent to a contract's formation.

153.    On or about February 16, 2010, Innerlight, through the Fort Lauderdale, Florida law firm, Tripp Scott, filed its motion to dismiss the Complaint. *Innerlight did not contest subject matter jurisdiction, personal jurisdiction or venue.* The law firm of Tripp Scott, through attorneys Paul Lopez and George Walker, actively represented Innerlight throughout the action until they sought to withdraw on November 30, 2010 six business days prior to the long-scheduled deposition of Innerlight for the reason, as Tripp Scott explained to the Court, that: "Innerlight, Inc. has decided that it no longer requires the services of Tripp Scott, P.A. to defend it in this lawsuit" and, therefore, had "instructed" Tripp Scott to withdraw.

154.    The Tripp Scott firm, through attorneys Paul Lopez and George Walker, also represented Innerlight in the Matrix v. Innerlight Florida Federal Action and represented InnerLight Holdings in 2010 in that certain filed against InnerLight Holdings in Broward County, Florida State Circuit Court entitled POP Holdings, Ltd. v. William J. Reilly, *et al*, Case No. 10-22774 (11).

155.    On or about April 16, 2010, Matrix served discovery requests upon Innerlight.

156.    On or about April 23, 2010, the Court entered an Order specially setting a one hour hearing on Innerlight's motion to dismiss for June 18, 2010.

157.    On or about May 4, 2010, Innerlight filed a motion for protective order seeking an Order relieving Innerlight from having to respond to Matrix's discovery requests on the basis of the pending motion to dismiss, and on or about May 5, 2010, Innerlight filed a corrected motion for protective order (the basis remained the same).

158.    On or about May 11, 2010, Matrix served a notice of hearing on Innerlight's corrected motion for protective order.

159.    On or about May 19, 2010, Matrix filed its Amended Complaint, as of right, against Innerlight for breach of the Exclusive Distribution Agreement.

160.    On or about May 20, 2010, the Court held a hearing on Innerlight's corrected motion for a protective order, attended and argued by counsel for both parties. The Court entered an Order denying the motion.

161.    On or about May 26, 2010, Innerlight filed a motion to dismiss the Amended Complaint, or, in the alternative, for a more definite statement.

162.    On or about June 3, 2010, Innerlight filed a motion for an enlargement of time to respond to the discovery requests, following the denial of its corrected motion for protective order.

163.    Innerlight's June 3, 2010 motion described Innerlight as "a large company which generates a large amount of documents."

164.    On or about June 2, 2010, Matrix filed its notice of hearing on Innerlight's motion for an enlargement of time to time to respond to Matrix's discovery requests.

165.    On or about June 8, 2010, Matrix filed its motion for the appointment of a commissioner to take Pennsylvania depositions.

166.    On or about June 8, 2010, the Court entered an Agreed Order setting a specially set hearing on Innerlight's motion to dismiss the Amended Complaint.

167.    On or about June 10, 2010, the Court entered an Agreed Order on Innerlight's motion for an enlargement of time to time to respond to Matrix's discovery requests.

168.    On or about June 11, 2010, Matrix filed its memorandum of law in opposition to Innerlight's motion to dismiss the Amended Complaint.

169.    On or about June 11, 2010, Innerlight filed its reply memorandum of law to Matrix's opposition to Innerlight's motion to dismiss the Amended Complaint.

170.    On or about June 11, 2010, Innerlight filed the first page of its responses to Matrix's first request for admissions.

171.    On or about June 18, 2010, the Court held a specially set hearing on Innerlight's motion to dismiss the Amended Complaint. The hearing was attended by Mr. Leigh, representing Matrix, and attorneys Paul Lopez and George Walker, representing Innerlight. At the conclusion of the hearing, during which the Court considered the motion, the parties' respective memoranda and argument of counsel for both parties, the Court entered an Order denying the motion to dismiss and ordering Innerlight to respond within twenty days thereafter.

172.    On or about July 10, 2010, Innerlight filed its Answer And Affirmative Defenses to the Amended Complaint of Matrix**.** *In its Answer, Innerlight admitted that the Florida State Court had subject matter jurisdiction; admitted that the Florida State Court had personal jurisdiction over Innerlight; and admitted that venue was properly laid in the Palm Beach County, Florida Circuit Court.*

173.    On or about July 11, 2010, Innerlight filed a notice of service of its answers to Matrix's first set of interrogatories and responses to Matrix's first document request.

174.    On or about July 12, 2010, Innerlight filed a notice of propounding its first set of interrogatories upon Matrix.

175.    On or about July 14, 2010, Innerlight filed a notice of propounding its first document request and first request for admissions upon Matrix.

176.     On July 15, 2010, Matrix's counsel, Mr. Leigh, wrote to Innerlight's counsel, Mr. Lopez, expressing Matrix's wish to depose Innerlight under Fla.R.Civ.P. 1.310(b)(6), Innerlight witnesses (including Mr. Brogan) and others, and requesting which of such persons' deposition should be arranged through Mr. Lopez (and for those who are to be arranged through him, that he please provide proposed dates).

177.     On or about July 22, 2010, the Court entered an Agreed Order granting Matrix's motion for the appointment of a commissioner to take Pennsylvania depositions.

178.     On or about July 29, 2010, Matrix filed its motion for an enlargement of time to respond to Innerlight's affirmative defenses.

179.     On or about August 4, 2010, the Court entered an Agreed Order granting Matrix's motion for an enlargement of time to respond to Innerlight's affirmative defenses.

180.     On or about July 29, 2010, Matrix filed its reply to Innerlight's first, second and fourth affirmative defenses.

181.     On or about August 12, 2010, Matrix filed its request for the Court to take judicial notice of the April 23, 2006 Memorandum and Order of Judge Mary A. McLaughlin in <u>Darius International, Inc. and Innerlight, Inc. v. Robert O. Young, et al</u>., Case No. 05-6184, United States District Court for the Eastern District of Pennsylvania. Therein, the Court made the following findings of fact on April 23, 2008 in a Memorandum and Order which were based upon, upon Matrix's information and belief, evidence presented to the Court by Darius International and Innerlight:

   o   As of December 8, 2005 (when a hearing was held on Darius International's and Innerlight's motion for a preliminary injunction), there were approximately 170,000 Innerlight distributors;

o Innerlight has distributors in 26 countries and sales in 45 countries. International sales made up about 20% of the company's revenues in 2005 and 35% to 36% of its revenues from January through October of 2006.

Upon information and belief, these findings of facts are true.

182.    On or about August 13, 2010, Matrix filed its unopposed motion for an enlargement of time to respond to Innerlight's discovery requests.

183.    On or about August 16, 2010, the Court entered an Agreed Order granting Matrix's unopposed motion for an enlargement of time to respond to Innerlight's discovery requests.

184.    On or about August 23, 2010, Innerlight filed a notice of service of its first document request, first request for admissions and first set of interrogatories upon Matrix.

185.    On or about August 26, 2010, Innerlight filed its motion to strike a portion of Matrix's reply to Innerlight's affirmative defenses.

186.    On or about August 30, 2010, Innerlight filed its motion to preclude Matrix's request for judicial notice.

187.    On September 9, 2010, Matrix noticed the depositions of Innerlight for October 20, 2010, Mr. Brogan for October 21, 2010 and Kathy Christiansen (also of Innerlight) for October 22, 2010, all in Provo, Utah. These were the long-awaited deposition dates furnished by Innerlight's counsel, Mr. Lopez, following Mr. Leigh's initial request of July 15, 2010, and Mr. Leigh's repeated follow-ups.

188.    On or about September 13, 2010, the Court entered an Agreed Order setting a specially set hearing on Innerlight's strike a portion of Matrix's reply to Innerlight's affirmative defenses.

36

189.     On or about September 14, 2010, Matrix filed its motion for the appointment of a commissioner to take Utah depositions.

190.     On or about September 17, 2010, Innerlight filed its notice of service of its second set of interrogatories and second document request to Matrix.

191.     On or about September 28, 2010, Innerlight filed its response to Matrix's fifth document request.

192.     On or about September 30, 2010, Innerlight filed a motion for a protective order and request for an *in camera* evidentiary hearing. The subject matter of the motion was discovery requested by Matrix which Innerlight claimed was trade secret privileged. The motion did not seek cancellation or postponement of the December 8-10, 2010 scheduled depositions.

193.     On or about September 30, 2010, Innerlight filed its notice of serving answers to Matrix's second set of interrogatories and its notice of withdrawing its laches affirmative defense.

194.     On or about October 4, 2010, the Court entered an Agreed Order granting Matrix's motion for the appointment of a commissioner to take Utah depositions.

195.     On or about October 8, 2010, Matrix served its memorandum of law in opposition to Innerlight's motion to strike a portion of Matrix's reply to Innerlight's affirmative defenses.

196.     On or about October 15, 2010, a hearing was held on the Innerlight's motion to strike a portion of Matrix's reply to Innerlight's affirmative defenses, attended by and argued by respective counsel for the parties. At the conclusion of the hearing, the Court entered an Order denying the motion.

197.     On or about October 19, 2010, Matrix served its re-notice of taking the deposition of Innerlight, Mr. Brogan and Ms. Kathy Christiansen (Innerlight's Operations Manager) for

December 8-10, 2010, to take place at the office of Matrix's Utah counsel, Hill, Johnson &

Schmutz in Provo, Utah. The rescheduling from the original dates of October 20-22, 2010 was

made at the request of Innerlight, and the new December 8-10, 2010 dates were the again offered

by Innerlight. According to Innerlight's counsel, these were the only dates available prior to

2011. Matrix acceded to the requested change in deposition dates.

198.    On October 27, 2010, nonparty witness Bill Holderby's deposition was taken.

Innerlight's counsel attended. This was the first and last deposition taken in the case. His

testimony was devastating to Innerlight's case. He confirmed that Innerlight repeatedly touted

that it was the exclusive distributor of the Beverly Sassoon product line, something it could only

have done by virtue the Exclusive Distribution Agreement with Matrix. An example of this was

an Innerlight-created "Beverly Sassoon PowerPoint Presentation", with audio, shown at the

deposition, featuring Mr. Brogan and Ms. McAnly (who then was the President of Innerlight).

That presentation was a part of the distributor kit Innerlight provided to new distributors (the

"NEW Distributor Kit Contents" sheet is the last page of Composite Exhibit "1".) Mr. Holderby

had not been disclosed by Innerlight in discovery as a person with knowledge of the subject

matter of the case nor had Innerlight produced the Innerlight-created "Beverly Sassoon

PowerPoint Presentation", despite a Matrix request for production to which it was specifically

responsive.

199.    On or about November 9, 2010, Innerlight filed a notice of serving answers to

Matrix's third set of interrogatories.

200.    On or about November 17, 2010, Innerlight filed a motion for a protective order

regarding the deposition of Innerlight set for December 8, 2010 (this was Innerlight's second

motion for protective order). Innerlight did not schedule a hearing on this motion, and never

sought to do so. That motion attached the Matrix October 19, 2010 re-notice of deposition of Innerlight for December 8, 2010. The motion did not seek cancellation or postponement of the December 8-10, 2010 scheduled depositions.

201.     On or about November 18, 2010, the Court entered an Order specially setting a one hour hearing on Innerlight's first motion for a protective order (the September 30, 2010 motion) for February 4, 2011 at 10:00 a.m. (with the date having been cleared with all counsel). Per the Court's Standing Order regarding specially set hearing, this hearing could not be cancelled except by further Court Order and counsel are required to be present personally at the hearing or submit an agreed order disposing of the motion. Innerlight never sought to have the hearing specially set for February 4, 2011 cancelled. Innerlight, through counsel or otherwise, did not appear at that hearing.

202.     On or about November 23, 2010, Innerlight pulled out the bankruptcy card: Mr. Lopez informed Mr. Leigh that Innerlight would <u>without</u> <u>fail</u> file for bankruptcy protection no later than November 29, 2010 unless the parties reached a resolution. The parties did not reach a resolution and November 23, 2010 came and went without such a filing.

203.     On or about November 30, 2010, Innerlight's counsel, Tripp Scott, served a motion to withdraw as counsel for Innerlight. Therein, Tripp Scott stated:

- o   "The Complaint in the instant case was filed in January of 2010."

- o   "Since that time, the law firm of Tripp Scott, P.A. has diligently represented Innerlight, Inc. in its defense."

- o   "Innerlight, Inc. has decided that it no longer requires the services of Tripp Scott, P.A. to defend it in this lawsuit. As a result of that decision, Innerlight, Inc. has asked Tripp Scott, P.A. to withdraw in this case."

- o   "Pursuant to Fla. Bar Rule 4-1.16(a), Tripp Scott, P.A. is not permitted to represent Innerlight, Inc. after it been instructed to withdraw as counsel for InnerLight, Inc."

o "Innerlight, Inc. has been informed by Tripp Scott, P .A, and understands that pursuant to Florida law, in order to continue defending this lawsuit, it must obtain new counsel."

204.     Upon information and belief, "Innerlight, Inc. ha[d] decided that it no longer require[d] the services of Tripp Scott, P.A." and "instructed" Tripp Scott to withdraw, as Tripp Scott states, as a last ditch gambit to avoid the taking of the long-sought depositions of Innerlight witnesses set for December 8-10, 2010, and Tripp Scott thus included in its motion a request to stay the lawsuit for a period of 30 days. It was the ultimate dilatory tactic: when all else fails fire your lawyers and then request a delay because you're now unrepresented.

205.     At the request of Tripp Scott, Matrix agreed to waive the local requirement of five days' notice of hearing on the motion in order for Tripp Scott's motion to withdraw to be heard the next day on December 1, 2010, and Tripp Scott served a notice of hearing on November 30, 2010 for a hearing on December 1, 2010, with Matrix's consent. That notice of hearing reflects service upon Mr. Brogan. Matrix, Mr. Leigh, had offered to reschedule the December 8-10, 2010 depositions yet again to sometime in the last two weeks of January, 2011 so long as Matrix's counsel was furnished with a pool of proposed alternative dates by the time of the December 1, 2010 hearing on the Tripp Scott motion. Such proposed alternative dates were not offered.

206.     At a December 1, 2010 hearing on Tripp Scott's motion to withdraw, attended by Mr. Walker of the Tripp Scott firm and Matrix's counsel, Mr. Leigh, the Court entered an Order granting Tripp Scott's motion to withdraw as counsel for Innerlight, but denying that portion of Tripp Scott's motion which sought a stay of the lawsuit. The Court ordered that all future pleadings, papers and motions be sent to Innerlight, care of Mr. Brogan. Matrix fully complied with this requirement. The language in the form of the Order proposed by Tripp Scott regarding the requested stay was stricken in the signed Order. At the conclusion of the hearing, Mr. Martin

of Tripp Scott informed Mr. Leigh that he (Mr. Martin) had sent an email to Mr. Brogan

conveying Matrix's offer to reschedule the depositions to sometime in last two weeks of January,

2011 and that Mr. Brogan had not responded. Notwithstanding Tripp Scott informing Innerlight

that in order to continue defending the lawsuit Innerlight had to obtain new counsel, Innerlight

never obtained new counsel.

207.    On December 1, 2010, in the afternoon following that morning's hearing granting

Tripp Scott's motion to withdraw, Mr. Lopez wrote to Mr. Leigh reiterating "that,

notwithstanding the lack of a stay, the persons…noticed for deposition are currently not planning

on attending the depositions." Mr. Lopez offered that it "would appear that flying to Utah would

be a waste of your client's time and money", took note of the "outstanding motion for protective

order" and encouraged suggested that Mr. Leigh "work with Innerlight, Inc. to procure

alternative deposition dates early in 2011."

208.    Later that day on December 1, 2010, Mr. Leigh wrote back to Mr. Lopez

confirming that he would be travelling to Utah for the depositions, and, with respect to the

pending (second) protective order, noted that Mr. Leigh had urged Innerlight to set it down for a

hearing prior to the depositions, but Innerlight did not do so, and that the mere pendency of such

a motion does not obviate the depositions. As for Mr. Lopez' encouragement that Mr. Leigh

work with Innerlight to procure alternative dates early in 2011, Mr. Leigh confirmed that he had

in fact previously offered to reschedule the October 8-10, 2010 depositions to sometime in the

last two weeks of January, 2011 so long as he was furnished with a pool of proposed alternative

dates by the time of the hearing that morning. Mr. Leigh also noted that Mr. Martin had advised

him that morning at the hearing's conclusion that Innerlight had not gotten back to Mr. Martin on

this point. Mr. Leigh strongly encourage Mr. Lopez to strongly encourage Innerlight witnesses to

reconsider their current plans and attend the depositions, which had long ago been properly scheduled to take place in Provo, Utah the following week, and, indeed, had been rescheduled from their original dates to the dates next week at such witnesses' request.

209.    Mr. Lopez did not respond to Mr. Leigh's December 1, 2010 letter; rather, Mr. Leigh received a letter from Mr. MacAniff on December 3, 2010 in which he advised Mr. Leigh that Innerlight was insolvent; that Innerlight did not plan to take any further action before the Court in the <u>Matrix v. Innerlight</u> Florida State Court Action (other than to file responses to requests for admissions); and that Innerlight expected that Matrix would file appropriate motions with the court to obtain a judgment against Innerlight. The letter was send, according to Mr. MacAniff, so that Mr. Leigh would not incur the time and expense to attend the Utah depositions, confirming again that the witnesses would not be showing up for the taking of their depositions.

210.    Mr. Leigh was repeatedly advised that the Innerlight witnesses would not be appearing for the taking of their depositions on December 8-10, 2010, notwithstanding that (a) Mr. Leigh had been trying to take these depositions for months (he had first asked in July, 2010); (b) the depositions had long already been scheduled on dates furnished by Innerlight (indeed, they were rescheduled at Innerlight's request to December 8-10, 2010 from the original also cleared dates of October 20-22, 2010); and, most importantly, (c) the Court denied the stay motion. In light of the fact that Mr. Leigh was repeatedly advised that the Innerlight witnesses would not be appearing for the taking of their depositions, Mr. Leigh in the end did not travel from Fort Lauderdale, Florida to Provo, Utah (a fact reflected in Matrix's January 6, 2011 show-cause motion against Innerlight and a finding of fact in the Court's Order dated February 8, 2011, discussed below). Matrix however never agreed to cancel the depositions, the depositions

were not cancelled and Matrix arranged for its Utah counsel, Stephen Quesenberry of the law firm of Hill, Johnson & Schmutz, L.C. of Provo, Utah, to attend the depositions, and Mr. Quesenberry did so, as did the court reporter.

211.    On December 8-10, 2010, the commissioner/court reporter appointed by the Court by Order dated October 4, 2010, as well Mr. Quesenberry, appeared at the appointed time and place for the deposition of Innerlight and the witnesses, and, as Mr. Leigh had been previously advised, Innerlight, Mr. Brogan and Ms. Christiansen were indeed no-shows.

212.    On or about December 16, 2010, Innerlight *pro se* filed (improperly so) its answers to Matrix's third request for admissions.

213.    On December 17, 2010, Matrix served its motion to strike Innerlight's response to Matrix's third request for admissions. Innerlight received a copy on December 17, 2010. Also son December 17, 2010, Mr. MacAniff wrote to Mr. Leigh advising him that it had been brought to Mr. MacAniff's attention that Matrix had, according to Mr. MacAniff, filed inaccurate court reporter's Statements of Nonappearance for the Innerlight witnesses and asked that the record be corrected.

214.    On December 22, 2010, Matrix served its notice of hearing on its motion to strike Innerlight's response to Matrix's third request for admissions. Innerlight received a copy on December 22, 2010.

215.    On December 22, 2010, Mr. Leigh also wrote back to Mr. MacAniff in response to his December 17, 2010 letter. Therein, Mr. Leigh stated, correctly so, that the Statements of Nonappearance were accurate and stating that Mr. MacAniff's request for a correction of the record was not well taken.

216.    On December 23, 2010, Mr. MacAniff wrote to Mr. Leigh stating again that the Statements of Nonappearance were incorrect and asking again that the record be corrected, noting that there "was no record of any court reporter having come to the InnerLight Holdings premises and the InnerLight premises in Provo, Utah on the dates scheduled for deposition." Mr. MacAniff was, apparently, operating under the mistaken belief that the depositions were to take place at such premises (although notably he did not state that the witnesses actually showed up).

217.    On January 4, 2011, Mr. Leigh wrote back to Mr. MacAniff again advising him, correctly so, that the record was correct. Nothing further on the matter was heard from Mr. MacAniff (or Innerlight).

218.    On or about December 27, 2010, Innerlight *pro se* filed (improperly so) a notice of having served upon Mr. Leigh Innerlight's answer to Matrix's third request for admissions. This was the last paper filed in the lawsuit by Innerlight.

219.    On January 6, 2011, Matrix served its motion for an order for Innerlight to show cause why a judgment by default should not be entered against Innerlight, or other action taken against it, for its failure to attend its deposition. Innerlight received a copy that day. That motion, among other things, reflected the filing of the Utah court reporter's Statement of Nonappearance of Innerlight at its scheduled deposition. Innerlight received the motion on January 6, 2011. That motion was faxed to Mr. Brogan with the following request:

> Attached is a copy of plaintiff's motion for the entry of an Order for Defendant to show cause why a judgment by default show not be entered against it, or other action permitted by Rule 1.380(d), for Defendant's failure to attend its deposition. In accordance with Local Rule 4, please let me know by Friday, January 7, 2011 at 5 p.m. EST whether defendant agrees with the relief requested in the motion. If I do not hear from you by that time I will assume that defendant disagrees.

Mr. Brogan did not get back to Mr. Leigh by January 7 or at any other time.

220.    On January 10, 2011, Matrix served its notice of hearing for January 18, 2011 on Matrix's show-cause motion. Innerlight received a copy that day.

221.    On January 18, 2011, the Court held a hearing on Matrix's show-cause motion, at which time the court granted the motion and ordered Innerlight to show cause on February 4, 2011 at 10:00 a.m. why a judgment by default show not be entered against it. Innerlight did not attend. The Order reflects copies of the same furnished to Mr. Leigh and Innerlight. Mr. Leigh furnished the Court with prepaid envelopes for this purpose, as is the practice of the Court. Upon information and belief, Mr. Brogan received a copy of the Order from the Court. In addition, on January 20, 2010, Mr. Leigh faxed a copy of Order to Mr. Brogan with the following message:

> Attached is a copy of the Court's January 18, 2011 ORDER FOR DEFENDANT TO SHOW CAUSE WHY A JUDGMENT BY DEFAULT SHOULD NOT BE ENTERED AGAINST DEFENDANT. Please be advised that the address of Judge McCarthy's courtroom for the show-cause hearing on February 4, 2011 at 10:00 a.m. is:
>
> Palm Beach County Courthouse
> 205 N. Dixie Highway
> Courtroom 9B
> West Palm Beach, FL 33401
>
> Also attached is PLAINTIFF'S MOTION FOR AN ORDER MODIFYING TEXT OF JANUARY 18, 2011 ORDER FOR DEFENDANT TO SHOW CAUSE WHY A JUDGMENT BY DEFAULT SHOULD NOT BE ENTEREED AGAINST IT and PLAINTIFF'S NOTICE OF HEARING ON THAT MOTION set for **Thursday, January 27, 2011 at 8:45 a.m.**
> (Emphasis original)

222.    On January 20, 2011, Matrix served its motion for an Order modifying the text of the January 18, 2011 Show-Cause Order and notice of hearing for January 27, 2011 at 8:45 a.m. Innerlight received a copy of the same that day by fax.

223.    On January 27, 2011, the Court held a hearing on Matrix's motion for an Order modifying the text of the January 18, 2011 Show-Cause Order. Innerlight did not attend. At the

hearing, the Court granted the motion, and entered an Amended Show-Cause Order ordering Innerlight to show cause on February 4, 2011 at 10:00 a.m. (the date and time had not changed) why a judgment by default show not be entered against Innerlight. The only change to the Amended Order was the Court's addition of the language in which the Court took note that Innerlight did not appear at the January 18, 2011 hearing. The Order reflects copies of the same furnished to Mr. Leigh and Innerlight. Mr. Leigh furnished the Court with prepaid envelopes for this purpose, as is the practice of the Court. In addition, on January 31, 2010, Mr. Leigh faxed a copy of Amended Order to Innerlight.

224.    On January 28, 2010, Matrix served its memorandum of law in opposition to Innerlight's motion for a protective order scheduled for a hearing on February 4, 2011 at 10:00 a.m. Innerlight received a copy on January 31, 2010.

225.    On February 4, 2011, the Court held an evidentiary show-cause hearing in accordance with the Court's January 18, 2010 Order as modified by the Amended Order of January 27, 2011. That hearing time had been also been specially reserved for Innerlight's September 30, 2010 motion for a protective order and request for an *in camera* evidentiary hearing. Innerlight did not attend.

226.    On or about February 8, 2011, the Court entered an Order On Show-Cause Hearing and Default Judgment On Liability Against Innerlight, setting forth findings of fact and conclusions of law. A true copy of the Order and Judgment is attached hereto as Exhibit "15". The Order reflects copies of the same furnished to Mr. Leigh and Innerlight. Mr. Leigh furnished the Court with prepaid envelopes for this purpose, as is the practice of the Court.

227.    Innerlight did not file a motion of a rehearing or to alter or amend the judgment under Rule 1.530(a) and (g) of the Florida Rules of Civil Procedure.

46

228.    On May 27, 2011, Matrix served its motion for Final Summary Judgment on Damages against Innerlight. Attached to the motion were copies of the February 8, 2011 Order On Show-Cause Hearing and Default Judgment On Liability Against Defendant, the Affidavit of Edward R. Tinari and the expert report of Cinnamin O'Shell Turk. Innerlight received it on May 27, 2011. Mr. Leigh also faxed a copy of the same to Mr. MacAniff on May 27, 2011, which he received. Neither Innerlight nor Mr. MacAniff responded.

229.    On June 2, 2011, Matrix served its notice of the filing of Affidavit of Cinnamin O'Shell Turk, CPA, CVA, CFE dated June 1, 2011, with a true copy of the Affidavit attached hereto. Innerlight received them on June 2, 2011. Mr. Leigh also faxed the same to Mr. MacAniff on June 2, 2011, and he received it that day. Neither Innerlight nor Mr. MacAniff responded.

230.    On June 3, 2011, Mr. Leigh sent to the Court a proposed Order setting a specially set hearing for Wednesday, July 6, 2011 at 8: 15 a.m. on Matrix's Motion For Final Summary Judgment On Damages. Innerlight and Mr. MacAniff received copies that day. Neither Innerlight nor Mr. MacAniff responded.

231.    On June 6, 2011, the Court entered an Order setting a specially set hearing for July 6, 2011 on Matrix's Motion For Final Summary Judgment On Damages against Innerlight. The Order reflects copies of the same furnished to Mr. Leigh and Mr. Brogan. Mr. Leigh furnished the Court with prepaid envelopes for this purpose, as is the practice of the Court. In addition, on June 8, 2011, Mr. Leigh, upon his receipt of the Order, faxed a copy of Order to Mr. Brogan and Mr. MacAniff, and they received the same on June 8, 2011. In addition, Mr. Leigh caused a Utah process server, Caleb Reeve of Tinsley Investigative Services, Inc., to serve Innerlight with a copy of the June 6, 2011 Order. Mr. Reeve served the Order upon Innerlight at

47

its place of business in Provo, Utah on June 10, 2011, by serving Mr. Shawn Parker, described in

the Return as a person in Innerlight's Compliance department. Upon information and belief, Mr.

Shawn Parker is employed by one or more of the defendants.

232.    On June 8, 2011, Matrix served its Fla. R. Civ. P. 1.440 (b) notice that the action

was at issue and ready to be set for a jury trial. This notice was mailed and faxed to Mr. Brogan

on June 8, 2011, and he received it by fax that day. Mr. Leigh also faxed the same to Mr.

MacAniff on June 8, 2011, and he received it that day. Neither Innerlight nor Mr. MacAniff

responded.

233.    On June 10, 2010, Matrix served its Statement Of Fact Not Subject To Dispute,

which was received by Innerlight and Mr. MacAniff that day. Neither Innerlight nor Mr.

MacAniff responded.

234.    On June 17, 2010, Matrix served its notice of filing the Affidavit of the Utah

process server who had served upon Innerlight the Order Setting Special Set Hearing On

Plaintiff's Motion For Final Summary Judgment On Damages Against Defendant. Innerlight and

Mr. MacAniff received copies that day by fax. Neither Innerlight nor Mr. MacAniff responded.

235.    On July 6, 2011, the Court held a hearing on Matrix's summary judgment motion.

Innerlight did not appear. A proposed Order on the motion was sent to the Court by Mr. Leigh on

July 6, 2011 in accordance with the Court's instructions at the hearing, together with prepaid

return envelopes for Mr. Leigh and Innerlight c/o Mr. Brogan, as is the Court's practice. Copies

of the proposed Order and cover letter to the Court were faxed to Mr. Brogan and Mr. MacAniff

on July 6, 2011 and they received such faxes that day. Neither Innerlight nor Mr. MacAniff

responded.

236.     On July 7, 2011, the Court entered an Order on Matrix's motion for Final Summary Judgment on damages against Innerlight. That Order reflects service upon Mr. Leigh and Innerlight, care of Mr. Brogan.

237.     On July 18, 2011, Matrix served its motion for a re-hearing of the Order on Matrix's summary judgment motion. Mr. Brogan and Mr. MacAniff received copies of the motion on July 18, 2011 by fax. Neither Innerlight nor Mr. MacAniff responded.

238.     On July 19, 2011, Matrix served its notice of filing the Declaration of Rick Catinella with the Declaration attached thereto. Mr. Brogan and Mr. MacAniff received copies of the notice by fax on July 19, 2011. Neither Innerlight nor Mr. MacAniff responded.

239.     On July 22, 2011, the Court entered an Order setting a specially set 30 minute hearing for September 2, 2011 on Matrix's motion for re-hearing of the July 7, 2010 Order on Matrix's summary judgment. The Order reflects copies of the same furnished to Mr. Leigh and Innerlight. Mr. Leigh furnished the Court with prepaid envelopes for this purpose, as is the practice of the Court. In addition, on July 28, 2011, Mr. Leigh, upon his receipt of the Order, faxed a copy of the same to Mr. Brogan and Mr. MacAniff, and they received their copies on July 28, 2011. Neither Innerlight nor Mr. MacAniff responded.

240.     On September 2, 2011, the Court held a hearing on Matrix's motion for re-hearing of portion of the Court's July 7, 2011 Order on Matrix's Summary Final Judgment against Innerlight. Innerlight did not attend. Mr. Leigh furnished the Court with prepaid envelopes himself and Innerlight c/o Mr. Brogan, as is the practice of the Court. The court reserved ruling at the hearing. Neither Innerlight nor Mr. MacAniff responded.

241.     On September 2, 2011, the Court entered Summary Final Judgment against Innerlight awarding Matrix damages in the sum of $15,311,529.00. A certified copy of the

judgment is attached hereto as Exhibit "16". On or about September 7, 2011, upon his receipt of the Summary Final Judgment from the Court, Mr. Leigh faxed a copy of the same to Mr. Brogan and Mr. MacAniff. They received a copy of the Summary Final Judgment against Innerlight on September 7, 2011.

242.    Innerlight did not file a motion of a rehearing or to alter or amend the Summary Final Judgment under Rule 1.530(a) and (g) of the Florida Rules of Civil Procedure.

243.    Innerlight did not appeal the Summary Final Judgment and the time to file a timely appeal has long expired.

244.    The Summary Final Judgment, at paragraph 2, required Innerlight to complete under oath the Florida Rule of Civil Procedure Form 1.977 Fact Information Sheet, including all required attachments, and to serve them on counsel for Matrix within 45 days from the date of the Judgment, unless the Judgment was satisfied. The Summary Final Judgment has not been satisfied.

245.    The deadline for Innerlight to complete under oath the Florida Rule of Civil Procedure Form 1.977 Fact Information Sheet, including all required attachments, and to serve them on counsel for Matrix, was October 17, 2011.

246.    Innerlight has failed to comply with the Florida State Court-ordered requirement to complete under oath the Florida Rule of Civil Procedure Form 1.977 Fact Information Sheet, including all required attachments, and to serve them on counsel for Matrix was October 17, 2011.

247.    On November 8, 2011, Matrix served its motion for contempt against Innerlight for Innerlight's failure to comply with the court-ordered requirement of furnishing the completed

Fact Information Sheet. That motion was served upon Mr. Brogan and Mr. MacAniff. They received it by fax on November 8, 2011.

248.    Mr. MacAniff has advised Mr. Leigh that Innerlight will not be complying with the Court-ordered requirement. As of February 28, 2012, Innerlight has not complied.

249.    Up to the time Tripp Scott withdrew from representing Innerlight in the <u>Matrix v. Innerlight</u> Florida State Court Action, that action was actively defended by Innerlight by and through counsel. After Tripp Scott's withdrawal, Innerlight, although on notice of all proceedings, deliberately chose not to defend the action and deliberately chose to flout the authority of the Court.

250.    Prior to, during and after, the <u>Matrix v. Innerlight</u> Florida State Court Action, Mr. Brogan was the President of defendant Innerlight.

251.    Prior to, during and after, the <u>Matrix v. Innerlight</u> Florida State Court Action, Mr. Brogan was the President of defendants InnerLight Holdings and InnerLight Worldwide.

**FIRST CLAIM FOR RELIEF**
**Fraudulent Transfer under Utah Code Ann. § 25-6-5(1)(a)**
**(All defendants)**

252.    Plaintiff incorporates herein by reference thereto paragraphs 1 through 251 above.

253.    Plaintiff was a creditor of Innerlight prior to the transfer of Innerlight's assets to InnerLight Holdings and InnerLight Worldwide. A "creditor" under the UFTA "means a person who has a claim." UTAH CODE ANN. § 25-6-2(4). A "claim under the UFTA "means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." UTAH CODE ANN. § 25-6-2(3). Alternatively, plaintiff's claim arose after the transfer.

254.    Plaintiff's right to payment from Innerlight under the Exclusive Distribution Agreement, which right has now been reduced to judgment, was a claim against Innerlight within

51

the meaning of UTAH CODE ANN. § 25-6-2(3) prior to the transfer of Innerlight's assets to InnerLight Holdings and InnerLight Worldwide.

255.    Upon information and belief, Quigley Corp. publicly disclosed the existence of the Innerlight v. Matrix Utah State Court Action, with the last such disclosure (given the sale of Innerlight in February of 2008) made on or about March 7, 2008, in Quigley Corp's Annual Report with the SEC for the fiscal year ended December 31, 2007. Therein Quigley Corp. noted the existence of Matrix's appeal before the Utah Supreme Court in the Innerlight v. Matrix Utah State Court Action and stated that no prediction as to the outcome of the appeal can be made.

256.    Innerlight was and is a debtor of Matrix within the meaning of UTAH CODE ANN. § 25-6-2(6).

257.    Upon information and belief, the February 29, 2008 Agreement between Quigley Corp. and InnerLight Holdings was a stock (share) sale, not an asset sale. Nothing about the February, 2008 transaction on the face of the Agreement indicated anything but a new 100% shareholder of Darius International (which wholly owned Innerlight). Nothing about the February 29, 2008 transaction, on the face of it, indicated a transfer of any assets out of Innerlight. Hence, had the transaction been just a stock sale, the sale would have left Innerlight in exactly the same position vis-a-vis its ability to respond to the claims of creditors as it occupied before the sale. Yet between the February, 2008 stock sale and the July, 2008 IPO of InnerLight Holdings, upon information and belief, Innerlight's *assets* were transferred to defendants InnerLight Holdings or InnerLight Worldwide and the existence of Innerlight as a free standing company possessing valuable assets was completely subsumed by defendants. Indeed, upon information and belief, defendants claim the transfers of the *assets* occurred on February 29, 2008, the day of the closing of the *stock* sale. Defendants InnerLight Holdings and InnerLight

52

Worldwide did not exist prior to February of 2008; *ipso facto*, these defendants had no assets prior to February of 2008. Their very *raison d'être* was to acquire all of Innerlight's business and assets. They accomplished their goal such that by the time of the IPO a few months later after the purchase of Innerlight's stock (shares) from Quigley Corp. (but not the sale of Innerlight's assets), Innerlight's entire business and assets had been denuded by InnerLight Holdings and InnerLight Worldwide. What had been the business of Innerlight was transmuted into the "Innerlight" business of defendants InnerLight Holdings and InnerLight Worldwide. If there is a document which reflects InnerLight Holdings' acquisitions of Innerlight's assets (as opposed to stock), InnerLight chose not to file it with the SEC.

258.    Upon information and belief, between February 29, 2008 (when InnerLight Holdings became the 100% shareholder of Darius International, which owned 100% of Innerlight) and July 18, 2008 (when InnerLight Holdings filed for its IPO), substantially all of the assets of Innerlight were transferred to InnerLight Holdings and InnerLight Worldwide, including, but not limited to, InnerLight's customer base, the "INNERLIGHT" trademark, copyrights, products, product formulations, and other proprietary information and intellectual property related to Innerlight's products, fixtures, furnishings, office equipment, office supplies, computer equipment, computer systems and software of Innerlight, inventory, supplies, records, files, intangible property, know-how and confidential information pertaining to Innerlight's customer base and Innerlight's products, all lists or information pertaining to customers, suppliers, vendors, clients, prospective clients or customers, manufacturers, distributors, and dealers, telephone and fax numbers, web sites, and internet addresses, the "INNERLIGHT" corporate name, training tools and materials (e.g., training manuals, audio and video cassettes,

DVDs, DCs, flash presentations, brochures, pamphlets and sales aids) and goodwill. Upon further information and belief, according to defendants, the assets of Innerlight consisting of:

(a) the domain name www.innerlightinc.com;

(b) the domain name InnerLightcompass.com;

(c) the trademark "ALKALIZE AND ENERGIZE WITH INNERLIGHT LIFESTYLE";

(d) the trademark "ALKALIZE AND ENERGIZE WITH INNERLIGHT LIFESTYLE"; and

(e) the trademark "INNERLIGHT ALKALARIAN LIFESTYLE"

were intended by defendants to be transferred to defendants InnerLight Holdings and InnerLight Worldwide on February 29, 2008. ***However***, Innerlight remains to this day the legal owner of such assets, notwithstanding defendants' assertion to the contrary. Upon information and belief, defendants assert that for these assets still owned by Innerlight, the failure to effectuate their transfer of legal ownership was an due to an "oversight" which now needs, according to defendants, to be "rectified".

259.    Upon information and belief, the following chart reflects what defendants believe to be the correct contact information for Innerlight as of February 1, 2008 and the correct contact information for InnerLight Holdings and InnerLight Worldwide as of March 1, 2008:

| CONTACT INFORMATION | FEBRUARY 1, 2008 INNERLIGHT, INC. | MARCH 1, 2008 INNERLIGHT HOLDINGS AND INNERLIGHT WORLDWIDE |
|---|---|---|
| Order Line | 800-677-0997 | 800-677-0997 |
| Distributor Services | 801-655-0601 | 801-655-0601 |
| Fax Line | 801-655-0621 | 801-655-0621 |
| International Order Line | 801-655-0635 | 801-655-0635 |
| International Distributor Services | 801-655-0645 | 801-655-0645 |
| Inquires | info@innerlightcorp.com | info@innerlightcorp.com |
| Web Site | www.innerlightinc.com | www.innerlightinc.com |
| Autoship Changes | autoship@innerlightcorp.com | autoship@innerlightcorp.com |

| Web Questions | webmaster@innerlightcorp.com | webmaster@innerlightcorp.com |
| International Issues | international@innerlightcorp.com | international@innerlightcorp.com |
| Compliance | compliance@innerlightcorp.com | compliance@innerlightcorp.com |

260.    On February 15, 2002, the "innerlightinc.com" domain name was registered to Innerlight. This domain name is a highly valuable asset of Innerlight. As of February 28, 2012, the domain name remains registered to Innerlight. Notwithstanding, upon information and belief, defendants claim that this domain name was transferred to defendant InnerLight Holdings on February 29, 2008 upon the closing of the Quigley Corp./InnerLight Holdings Agreement.

261.    Upon information and belief, between February 29, 2008 and July 18, 2008, defendants attempted to excise all references to Innerlight on the Innerlight web site and replace "Innerlight, Inc." with "InnerLight Worldwide, Inc." However, out of the thousands of web pages on the site, defendants' web specialist tasked with the job missed a few references to Innerlight, Inc. on foreign language pages. In sum, every reference to "InnerLight Worldwide" on the Innerlight web site previously referred to "Innerlight, Inc." prior to its attempted eradication by defendants.

262.    Upon information and belief, on March 25, 2008, Innerlight registered the trademark "ALKALIZE AND ENERGIZE WITH INNERLIGHT LIFESTYLE", Registration No. 3403119, with the U.S. PTO. Upon information and belief, Innerlight owns this trademark.

263.    Defendant InnerLight Holdings and/or defendant InnerLight Worldwide use the "ALKALIZE AND ENERGIZE WITH INNERLIGHT LIFESTYLE" trademark or a close variation thereof is marketed and sold worldwide on the www.innerlightinc.com website. Upon information and belief, defendants do so without compensation or remuneration to Innerlight. Defendants (or one of them) claim ownership of this trademark.

264.    Upon information and belief, defendant InnerLight Holdings claims to be owner of the "ALKALIZE AND ENERGIZE WITH INNERLIGHT LIFESTYLE" trademark as of February 29, 2008 upon the closing of the Quigley Corp./InnerLight Holdings Agreement.

265.    Upon information and belief, on or about February 12, 2009, Innerlight registered the domain name innerlightcompass.com. Upon information and belief, the website www.innerlightcompass.com, which markets to "Innerlight distributors" a sales program called the Compass System, is now utilized and controlled by defendant InnerLight Worldwide.

266.    Upon information and belief, defendant InnerLight Holdings claims to be owner of the domain name innerlightcompass.com as of February 29, 2008 upon the closing of the Quigley Corp./InnerLight Holdings Agreement.

267.    Upon information and belief, on October 3, 2009, the U.S. PTO Registration No. 2691153 "INNERLIGHT" trademark, registered to Innerlight, was cancelled by the PTO for failure to file the required continued use affidavit under Section 8 of the Trademark Act. This failure was orchestrated by defendants InnerLight Holdings and InnerLight Worldwide as a means to dispossess Innerlight of its valuable "INNERLIGHT" trademark so as to enable these defendants to claim the mark for themselves, and they have indeed done so.

268.    Upon information and belief, defendant InnerLight Holdings claims to be owner of the "INNERLIGHT" trademark as of February 29, 2008 upon the closing of the Quigley Corp./ InnerLight Holdings Agreement.

269.    On February 10, 2010, Innerlight registered the trademark "INNERLIGHT ALKALARIAN LIFESTYLE", Registration No. 3753333, with the PTO. Upon information and belief, Innerlight owns this trademark. Upon information and belief, defendant InnerLight Holdings and/or defendant InnerLight Worldwide use this trademark on the

www.innerlightinc.com website. Upon information and belief, defendants do so without compensation or remuneration to Innerlight.

270.    Defendant InnerLight Holdings claims that the "INNERLIGHT ALKALARIAN LIFESTYLE" trademark was transferred on February 29, 2008 from Innerlight to InnerLight Holdings upon the closing of the Quigley Corp./InnerLight Holdings Agreement.

271.    Upon information and belief, on August 31, 2010, Innerlight registered the trademark "ALKA-BLAST" with the U.S. PTO.

272.    Upon information and belief, Innerlight owns the "ALKA-BLAST" trademark.

273.    Upon information and belief, defendant InnerLight Holdings and/or defendant InnerLight Worldwide use the "ALKA-BLAST" trademark on the eponymous product in the Innerlight line of products, including, but not limited to, as marketed and sold worldwide on the www.innerlightinc.com website. That website featuring the Alka-Blast product (and displaying the trademark symbol ™) can be found at http://www.innerlightinc.com/Family_Alka-Blast.aspx?ID=2. The displaying of the ™ symbol rather than the ® symbol denoting a federally registered trademark is designed to deny attribution of ownership of the mark to Innerlight, and to appropriate the same to defendants for their own use and benefit.

274.    Defendant InnerLight Holdings claims that the "ALKA-BLAST" trademark was transferred on February 29, 2008 from Innerlight to InnerLight Holdings upon the closing of the Quigley Corp./ InnerLight Holdings Agreement.

275.    A true copy of the Innerlight's "Policies and Procedures" for distributors is attached hereto as Exhibit "17". A true copy of the InnerLight Worldwide's "Policies and Procedures" for distributors is attached hereto as Exhibit "18". They are identical, or nearly so. The last page of each contains the identical contact information, straight down the line.

276.     Innerlight also published a newsletter for its distributors called "Innergizer Quarterly". A black and white copy of the color issue of the March, 2005 issue of Innergizer Quarterly is attached hereto as Exhibit "19". It states below the title "The Official Publication of Innerlight, Inc." This is the issue that introduced the Innerlight exclusive Beverly Sassoon product line which Innerlight had acquired from Matrix under the Exclusive Distribution Agreement.

277.     A true copy of the Fall, 2006 issue of Innerlight's Innergizer Quarterly marketing newsletter is attached hereto as Exhibit "20". It also states below the title "The Official Publication of Innerlight, Inc."

278.     A true copy of the Winter, 2009 issue of Innerlight's Innergizer Quarterly is attached hereto as Exhibit "21". It no longer states below the title "The Official Publication of Innerlight, Inc.", but rather, in keeping with defendants' stripping of Innerlight's assets, simply "The Official Publication of Innerlight".

279.     Upon information and belief, in March, 2008, following defendant InnerLight Holdings' acquisition of Darius International (which wholly owned Innerlight), InnerLight Holdings terminated all of Innerlight's distribution agreements with its independent distributors and all such distributors (and future distributors) were required to enter into new distribution agreements with InnerLight Worldwide, or, alternatively, InnerLight Holdings.

280.     Upon information and belief, assets of Innerlight were transferred to defendant InnerLight Holdings and/or defendant InnerLight Worldwide sometime between InnerLight Holdings' purchase of the shares of Innerlight (but not the assets of Innerlight) on February 29, 2008 and the July, 2008 IPO of InnerLight Holdings.

281.     Assets of defendant Innerlight were transferred to defendant InnerLight Holdings and/or defendant InnerLight Worldwide in the window of time between Innerlight's victory

against Matrix in the Utah trial court and its defeat on Matrix's appeal at the Utah Supreme

Court.

282.    Upon information and belief, the transfer was fraudulent to as to plaintiff because

Innerlight made the transfer with actual intent to hinder, delay or defraud plaintiff.

283.    Upon information and belief, defendant InnerLight Holdings is an insider within

the meaning of UTAH CODE ANN. § 25-6-2(7).

284.    Upon information and belief, defendant InnerLight Worldwide is an insider

within the meaning of UTAH CODE ANN. § 25-6-2(7).

285.    Upon information and belief, substantially all of Innerlight's assets were

transferred to defendant InnerLight Holdings and/or defendant InnerLight Worldwide.

286.    Upon information and belief, Innerlight became insolvent shortly after the

transfers were made (or as a result of the transfer of its assets) to defendant InnerLight Holdings

within the meaning of UTAH CODE ANN. § 25-6-5(2)(i).

**SECOND CLAIM FOR RELIEF**
**Fraudulent Transfer under Utah Code Ann. § 25-6-5(1)(b)**
**(All defendants)**

287.    Plaintiff incorporates herein by reference paragraphs 1 through 251, 253 through

281 and 283 through 286 above as if fully set forth herein.

288.    The transfers complained of herein were fraudulent as to plaintiff because

Innerlight made the transfers without receiving a reasonable equivalent value in exchange for

each of the transfers and the transfers were made at a time when Innerlight was engaged in a

business for which the remaining assets of Innerlight were unreasonably small in relation to the

business, or, alternatively, Innerlight intended to incur or believed or reasonably should have

believed that it would incur, debts beyond its ability to pay as they became due (such as Innerlight's debt to plaintiff arising under the Exclusive Distribution Agreement).

### THIRD CLAIM FOR RELIEF
### Fraudulent Transfer under Utah Code Ann. § 25-6-6(1)(a)
### (All defendants)

289.     Plaintiff re-alleges incorporates herein by reference thereto paragraphs 1 through 251, 253 through 281 and 283 through 286 above as if fully set forth herein.

290.     Plaintiff's claim against Innerlight arose before the transfer of Innerlight's assets to defendants InnerLight Holdings and InnerLight Worldwide. Plaintiff was a creditor of Innerlight prior to the transfer of Innerlight's assets to InnerLight Holdings and InnerLight Worldwide. A "creditor" under the UFTA "means a person who has a claim." UTAH CODE ANN. § 25-6-2(4). A "claim under the UFTA "means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." UTAH CODE ANN. § 25-6-2(3).

291.     The transfers described herein are fraudulent as to plaintiff because Innerlight made the transfers without receiving a reasonable equivalent value in exchange for the transfers and Innerlight became insolvent as a result of the transfers.

### FOURTH CLAIM FOR RELIEF
### Declaratory Judgment -- Alter Ego Liability
### (Defendant InnerLight Holdings)

292.     Plaintiff re-alleges incorporates herein by reference thereto paragraphs 1 through 251, 253 through 281 and 283 through 286 above as if fully set forth herein.

293.     This is a declaratory judgment action under 28 U.S.C. § 2201 (2010).

294.     Defendant InnerLight Holdings is the alter ego of Innerlight because InnerLight Holdings totally dominates and controls Innerlight and operates the business of Innerlight as its own business. Innerlight manifests no separate corporate interests of its own and functions solely

to achieve the purposes of InnerLight Holdings. Upon information and belief, Defendant

InnerLight Holdings and Innerlight have common stock ownership; InnerLight Holdings and

Innerlight have common directors and officers; InnerLight Holdings and Innerlight file

consolidated financial statements and tax returns (or, alternatively, Innerlight files no tax

returns); Innerlight operates with no capital or grossly inadequate capitol; InnerLight Holdings

uses Innerlight's property and assets as its own; the daily operations of the two corporations are

not kept separate; and Innerlight does not observe the basic corporate formalities, such as

keeping separate books and records and holding shareholder and board meetings; and the

directors and officers of Innerlight do not act independently in the interest of the company.

### FIFTH CLAIM FOR RELIEF
#### Declaratory Judgment -- Alter Ego Liability
#### (Defendant InnerLight Worldwide)

295.    Plaintiff re-alleges incorporates herein by reference thereto paragraphs 1 through

251, 253 through 281 and 283 through 286 above as if fully set forth herein.

296.    This is a declaratory judgment action under 28 U.S.C. § 2201 (2010).

297.    Defendant InnerLight Worldwide is the alter ego of Innerlight because InnerLight

Worldwide totally dominates and controls Innerlight and operates the business of Innerlight as its

own business. Innerlight manifests no separate corporate interests of its own and functions solely

to achieve the purposes of InnerLight Worldwide. Upon information and belief, Defendant

InnerLight Worldwide and Innerlight have common stock ownership; InnerLight Worldwide and

Innerlight have common directors and officers; InnerLight Holdings and Innerlight file

consolidated financial statements and tax returns (or, alternatively, Innerlight files no tax

returns); Innerlight operates with no capital or grossly inadequate capitol; InnerLight Holdings

uses Innerlight's property and assets as its own; the daily operations of the two corporations are

not kept separate; and Innerlight does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings; and the directors and officers of Innerlight do not act independently in the interest of the company.

### SIXTH CLAIM FOR RELIEF
### Declaratory Judgment -- Successor Liability
### (Defendant InnerLight Holdings)

298.   Plaintiff re-alleges incorporates herein by reference thereto paragraphs 1 through 251, 253 through 281 and 283 through 286 above as if fully set forth herein.

299.   This is a declaratory judgment action under 28 U.S.C. § 2201 (2010).

300.   Defendant InnerLight Holdings expressly assumed all of the existing liabilities of Innerlight, Inc.

301.   On July 18, 2008, Innerlight's liability to Matrix under the Exclusive Distribution Agreement was an existing liability of Innerlight.

### SEVENTH CLAIM FOR RELIEF
### Declaratory Judgment -- Successor Liability
### ((Defendants InnerLight Holdings and InnerLight Worldwide)

302.   Plaintiff re-alleges incorporates herein by reference thereto paragraphs 1 through 251, 253 through 281 and 283 through 286 above as if fully set forth herein.

302.   Defendants are liable to plaintiff under the theory of successor liability for Innerlight's liability to plaintiff under the Exclusive Distribution Agreement as reduced to judgment in the Florida State Court Action. This is so because there was a *de facto* merger or consolidation of InnerLight Holdings, InnerLight Worldwide and Innerlight and/or InnerLight Holdings and InnerLight Worldwide are mere continuations of Innerlight.

**EIGHTH CLAIM FOR RELIEF**
**Action on a Judgment**
**((Defendant Innerlight)**

303.    Plaintiff re-alleges incorporates herein by reference thereto paragraphs 1 through 12, 152, 153, 172, 226, 227, 241 and 242 above as if fully set forth herein.

304.    This is cause of action for action on a judgment under Utah common law.

305.    The Florida judgment is a final judgment.

306.    The Florida judgment is valid and enforceable in the State of Florida.

307.    The Florida court which rendered the Florida judgment had subject matter jurisdiction over the matter.

308.    The Florida court which rendered the Florida judgment had personal jurisdiction over defendant Innerlight.

309.    The Florida judgment remains completely unpaid and unsatisfied.

310.    The Florida judgment is entitled to full faith and credit by this Court pursuant to 28 U.S.C. § 1738.

**PRAYER FOR RELIEF**

Plaintiff, The Matrix Group LLC, hereby prays for judgment against defendants Innerlight, Inc., InnerLight Holdings, Inc. and InnerLight Worldwide, Inc. as follows:

A.  As for the first, second and third claims for relief, avoidance of one or more of the transfers described herein to the extent necessary to satisfy Matrix's claim against Innerlight, Inc. pursuant to UTAH CODE ANN. § 25-6-8;

B.  As for the first, second and third claims for relief, attachment of defendants' assets to secure payment of Matrix's claim against Innerlight, Inc. pursuant to UTAH CODE ANN. § 25-6-8;

C.  As for the first, second and third claims for relief, an injunction precluding defendants from making any further transfers of the assets described herein pursuant to UTAH CODE ANN. § 25-6-8;

D.  As for the first, second and third claims for relief, an order of this Court permitting Matrix to levy execution on the assets transferred or its proceeds pursuant to UTAH CODE ANN. § 25-6-8;

E.  As for the first, second and third claims for relief, for an imposition of a constructive trust and/or resulting trust upon all assets transferred to defendants pursuant to UTAH CODE ANN. § 25-6-8;

F.  As for the first, second and third claims for relief, for any and all relief available under the Uniform Fraudulent Transfer Act, including a judgment for damages against defendants pursuant to UTAH CODE ANN. § 25-6-8(1)(c)(iii) and/or UTAH CODE ANN. § 25-6-8(2).

G.  As for the fourth through seventh claims for relief, judgment against defendants InnerLight Holdings, Inc. and InnerLight Worldwide, Inc. declaring them alter egos and/or successors of Innerlight, Inc. and entering judgment against these defendants in the sum of $15,311,529.00.

H.  As for the eighth claim for relief, judgment against defendant Innerlight, Inc. on the Florida judgment.

I.  Such other and additional relief as this Court may deem just and proper.

Plaintiff, The Matrix Group LLC, respectfully demands a jury trial on all issues so triable.

DATED this ___ day of February, 2012.

**HILL, JOHNSON & SCHMUTZ, L.C.**
**BARTHE & LEIGH LLP**

_/s/_ Christopher K. Leigh
Attorneys for the Plaintiff